**WATT, TIEDER, KILLIAN & HOFFAR, a Virginia partnership, Plaintiff–Appellant,**

v.

**UNITED STATES FIDELITY & GUARANTY CO., a Maryland Capital Stock Co., Defendant–Appellee,**

**and**

**Concerning Robert G. Watt, Thomas B. Newell, and John J. Joyce, Appellants.**

**No. 91CA0523.**

Colorado Court of Appeals, Div. IV.

Aug. 13, 1992.

Rehearing Denied Sept. 10, 1992.

Certiorari Denied Feb. 22, 1993.

Wolf & Slatkin, P.C., Albert B. Wolf, Denver, for plaintiff-appellant and appellants.

Dixon and Snow, P.C., Steven Janiszewski, Denver, for defendant-appellee.

Opinion by Judge CRISWELL.

Plaintiff, a law firm practicing as a general partnership in Virginia, two of its part-

ners (Watt and Newell), and an associate (Joyce), appeal from judgments of the trial court finding all of them in punitive contempt of court for their failure to engage Colorado counsel to represent them and imposing monetary fines upon each of them for such contempt. The court's findings were grounded upon its conclusion that the Virginia partnership was a legal entity which could not appear either *pro se* or through any of its partners in the courts of Colorado. Because we disagree with the trial court's basic premise as to the nature of a general partnership under either Colorado or Virginia law, we reverse and remand the cause to the trial court for its reconsideration.

In previous litigation before the trial court, the law firm and certain of its partners and associates, together with local counsel, represented a defendant, MCI Contractors, Inc. (MCI), which was the principal contractor on a public construction project with the City of Pueblo. Another defendant, H.E. Chapman Construction Co., Inc. (Chapman), a subcontractor on that project, asserted various claims against MCI, and MCI counterclaimed against Chapman.

While that litigation was pending, the principal officers of MCI and Chapman, without the assistance of counsel, entered into a settlement agreement. Pursuant to the terms of that agreement, MCI deposited certain funds in escrow with the law firm, the distribution of which was subject to the occurrence of certain conditions, including Chapman's payment of its suppliers and the furnishing of lien waivers to MCI.

Chapman later assigned its interest in the escrowed funds to the defendant in this action, United States Fidelity and Guaranty Co. (USF & G), who intervened in the underlying litigation. In addition, Chapman's counsel sought to assert an attorney's lien against the escrowed funds.

In response to counsel's lien claim, the trial court, without considering MCI's assertion that the escrowed funds were not payable because Chapman had not complied with the terms of the settlement agreement, ordered MCI to pay a portion of those funds to Chapman's counsel.

The instant action was then initiated in the name of the law firm pursuant to the interpleader provisions of C.R.C.P. 22. Its complaint referred to the terms of the settlement agreement and the prior order of court, noted MCI's assertion that Chapman had not complied with the terms of the settlement agreement, but alleged that other defendants were asserting a present interest in the funds, and sought a judicial declaration as to the proper disposition of the funds.

This interpleader complaint did not assert that the law firm had any interest in the funds, nor did the law firm or any of its partners seek to represent any party claiming an interest in the funds; they had all previously withdrawn from their representation of MCI. The complaint was signed by Newell, a partner in the firm, and bore the typewritten names of Watt, another partner, and Joyce, an associate.

Simultaneously with the filing of this complaint, the law firm deposited with the registry of the court the amount that the court had previously ordered MCI to pay to Chapman's counsel. In spite of this deposit, the trial court found MCI in contempt of court for its failure to pay any funds to such attorney. However, in an original action brought in the supreme court by MCI, that court concluded that the trial court's order directing payment to counsel was entered in error and that the court's later finding of contempt constituted an abuse of discretion. *MCI Constructors, Inc. v. District Court,* 799 P.2d 40 (Colo. 1990). The supreme court also concluded that the interpleader action which MCI had asked the law firm, as escrow agent, to file was, under the circumstances, a proper response by MCI to the court's order to pay.

More than two months after the law firm filed its complaint in interpleader, but only five days after MCI filed its petition invoking the original jurisdiction of the supreme court, USF & G filed a motion seeking to hold the law firm, its two partners, Watt and Newell, and its associate, Joyce, in punitive contempt of court. Its basis for

such action was its assertion that, under the Uniform Partnership Law, § 7–60–101, et seq., C.R.S. (1986 Repl.Vol. 3A), "a partnership, like a corporation, is an artificial entity created by law," and, therefore, cannot appear either *pro se* or through a partner.

After an evidentiary hearing, held prior to the supreme court's action upon MCI's petition, the trial court specifically accepted USF & G's assertion with respect to the entity status of a partnership and held, therefore, that such an entity cannot be represented by anyone not admitted to the Colorado bar.

Based on this conclusion and on a judicial concession that none of the lawyer respondents had been so admitted, the trial court found each of them, as well as the law firm, in punitive contempt of court. As a penalty for such contempt, all of the respondents were required to pay the fees and costs incurred by USF & G in prosecution of the contempt proceedings, and Joyce, the associate, was fined an additional $500.

## I.

■ After all of the briefs in this cause were filed in this court, we requested the parties, on a *sua sponte* basis, to file supplemental briefs on the question whether a trial court has jurisdiction to conduct punitive contempt proceedings in instances in which the sole allegation is that an individual is engaged in the unauthorized practice of law in violation of rules adopted by the Colorado Supreme Court. The parties have submitted such briefs and we have considered them.

We conclude that, while there is language in *Denver Bar Ass'n v. Public Utilities Commission,* 154 Colo. 273, 391 P.2d 467 (1964), that would support the conclusion that such proceedings are within the exclusive jurisdiction of the supreme court, the trial court's jurisdiction over these proceedings were authorized by C.R.C.P. 230(b). That rule expressly recognizes the right of "any court or judge thereof to punish for contempt any person or legal entity not having a license from [the supreme court] who practices law or attempts to practice law in any matter which comes within the jurisdiction of that court...."

Hence, we conclude that the trial court was vested with jurisdiction to conduct the punitive contempt proceedings in this case, and this court is vested with jurisdiction to review its judgment.

## II. THE UNAUTHORIZED PRACTICE OF LAW

The Colorado Supreme Court has declared that defining the practice of law and regulating the same are judicial functions that are within the exclusive jurisdiction of that court. *Denver Bar Ass'n v. Public Utilities Commission, supra.*

■ In defining such activity, the supreme court has emphasized that "it has been held time and again that a natural person may appear in his own behalf and represent himself, notwithstanding he may not be a lawyer." *Denver Bar Ass'n v. Public Utilities Commission, supra.* And, of course, a natural person in a criminal case has a constitutional right to appear without counsel. *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

Consequently, the supreme court has defined a person who engages in the practice of law as one who "acts in a representative capacity in practicing, enforcing, or defending *the legal rights and duties of another.*" *Denver Bar Ass'n v. Public Utilities Commission, supra* (emphasis supplied).

Without passing upon its validity, we note that since 1905 there has also existed a Colorado statute which has declared it to be contempt of court for anyone not licensed to do so to appear "in any court of record in the state to conduct a suit, action, proceeding, or cause for *another person.*" Section 12–5–112, C.R.S. (1991 Repl.Vol. 5A) (emphasis supplied).

■ However, not all appearances in a representative capacity constitute the practice of law. If the nature of the proceeding is neither judicial nor quasi-judicial, such an appearance is not improper. *Denver Bar*

*Ass'n v. Public Utilities Commission, supra.*

Further, there exist certain circumstances in which "no legal principle is involved and the subject matter of the hearing has a value or represents an amount insufficient to warrant the employment of an attorney," and in which the supreme court has granted permission for lay representation. *Denver Bar Ass'n v. Public Utilities Commission, supra. See also Conway–Bogue Realty Investment Co. v. Denver Bar Ass'n*, 135 Colo. 398, 312 P.2d 998 (1957) (real estate brokers not enjoined from preparing legal instruments for other parties in transactions in which they act as brokers). Similarly, the General Assembly has attempted to authorize lay representation under similar circumstances. *See* § 13–1–127(2), C.R.S. (1991 Cum.Supp.) (closely held corporation may appear by one of its officers before any court of record or before agency if amount in controversy does not exceed $10,000); § 13–6–407(2), C.R.S. (1991 Cum.Supp.) (various lay persons may appear in small claims court on behalf of partnerships, unions, unincorporated associations and corporations, but no attorney may do so).

■ Thus, there may be several considerations that enter into the determination whether a particular activity amounts to the unauthorized practice of law. Nevertheless, the basic and initial question must always be whether the individual's appearance is in a representative capacity to protect, enforce, or defend the rights or duties of someone else.

## III. THE STATUS OF A PARTNERSHIP UNDER THE UNIFORM PARTNERSHIP ACT

USF & G asserts that, because a partnership is "created" by the Uniform Partnership Act (the Act), which has been adopted both by Colorado, §§ 7–60–101 through 7–60–143, C.R.S. (1986 Repl.Vol. 3A), and by Virginia, Va.Code Ann. §§ 56–1 through 56–43 (1989), any partnership existing in either state is, like a corporation, a legal entity having an existence separate from its partners. And, in concluding that the

individual lawyer respondents here had engaged in the unauthorized practice of law, the trial court specifically relied upon this precept. We conclude, however, that such conclusion represents a basic misperception of the effect of the Act.

Partnerships existed and were recognized by the common law long prior to the adoption of the Act. Under the common law principles applied to such associations, partnerships were not recognized as entities; they were merely aggregations of individuals. *See* 1 Z. Covitch, *Business Organizations* § 11.02, at 11–5 to 11–8 (1973).

However, the strict application of this aggregate theory led to several practical problems when a partnership engaged in business transactions.

Because a partnership was not a legal entity, the title to property could not be held or conveyed in the partnership's name. It was the partners (*all* of them) who, as co-owners of the property, were required to receive and convey such title. Similarly, because each partner had a personal interest in partnership property, a creditor could have that interest applied to an individual partner's indebtedness, even though the indebtedness was wholly personal, having no relation to the partnership business. Z. Covitch, *supra.*

Further, because the partnership had no separate existence, it could not sue or be sued. Any litigation had to be commenced and maintained in the names of the partners, all of whom had to be joined as parties. *McCormick v. Romans*, 214 Va. 144, 198 S.E.2d 651 (1973). *See Daniels Insurance Co. v. Daon Corp.*, 106 N.M. 328, 742 P.2d 540 (1987).

As a result of these and other practical problems encountered because of the common law's recognition of the aggregate nature of the partnership relationship, the original drafters of the Act initially considered changing the common law rule so as to endow a partnership with a legal existence separate from its constituent partners. However, the adoption of this entity theory would have meant that the partners

would no longer be principals and liable, as such, for the partnership's debts.

Ultimately, therefore, the drafters rejected the entity theory and incorporated the common law aggregate theory into the provisions of the Act. However, they also modified certain of the common law rules in an attempt to alleviate some of the problems to which the aggregate theory had given rise. For a description of the drafting committee's decisions, *see The Uniform Partnership Act—a Reply to Mr. Crane's Criticism*, 29 Harv.L.Rev. 158 and 291 (1916) (discussion by committee's reporter).

Thus, the Act, as adopted by both Virginia and Colorado, defines a partnership as simply "an association of two or more persons to carry on as co-owners a business for profit." Va.Code Ann. § 50–6 (1989); § 7–60–106, C.R.S. (1986 Repl.Vol. 3A). It also provides that each partner has a property interest in the specific property of the partnership, Va.Code Ann. §§ 50–24 and 50–25 (1989); § 7–60–124 and § 7–60–125, C.R.S. (1986 Repl.Vol. 3A), and that each partner is jointly and severally liable both for the debts of the partnership and for the tortious acts of each of the partners. Va. Code Ann. §§ 50–13, 50–14, and 50–15 (1989); §§ 7–60–113, 7–60–114, and 7–60–115, C.R.S. (1986 Repl.Vol. 3A).

At the same time, other provisions of the Act allow title to property to be held and conveyed in the common name of the partnership, Va.Code Ann. §§ 50–8 and 50–10 (1989); § 7–60–118 and § 7–60–110, C.R.S. (1986 Repl.Vol. 3A), and prevent a creditor of an individual partner from levying upon that partner's interest in such property. Va.Code Ann. §§ 50–25 and 50–28 (1989); § 7–60–125 and § 7–60–128, C.R.S. (1986 Repl.Vol. 3A).

Finally, although not a part of the Act, many states have adopted other statutes allowing partners to sue or to be sued in their common partnership name. Va.Code Ann. § 50–8.1 (1989); § 13–50–105, C.R.S. (1987 Repl.Vol. 6A).

 The result of these differing provisions is that, while a partnership is not a legal entity under the Act, it is, nevertheless, treated as such for certain limited purposes. *See* Jenson, *Is a Partnership Under the Uniform Partnership Act an Aggregate or an Entity?*, 16 Vand.L.Rev. 377 (1963).

Prior Colorado decisions have confirmed, in varying contexts, the underlying principle that a partnership formed under the Act is not a legal entity. Thus, in *People v. Clayton*, 728 P.2d 723 (Colo.1986), the supreme court held that, because it is the partners, and not the partnership, who are the owners of partnership property, a partner cannot be guilty of theft of that property.

Similarly, in *Hancock Construction Co. v. Cummins*, 791 P.2d 1208 (Colo.App. 1990), it was said that, because "a partnership or joint venture is not a separate entity," a working partner cannot be considered to be an employee of the partnership. Thus, such a partner is not covered by the Workers' Compensation Act, absent compliance with a special statute authorizing business owners to be provided with such coverage. *See* § 8–44–102, C.R.S. (1986 Repl.Vol. 3B).

Finally, in *Cooley Investment Co. v. Jones*, 780 P.2d 29 (Colo.App.1989), it was determined that a conveyance of property to a partnership from one of the partners was "only a change in the form of ownership, not a transfer of the property to another entity." Hence, such conveyance did not violate the terms of a broker's listing agreement. *See also Westfield Development Co. v. Rifle Investment Associates*, 786 P.2d 1112 (Colo.1990) (under California's limited partnership act, a partnership is not a legal entity; hence, the general partner of such a partnership cannot be liable for tortious interference with his partnership's contract because he is a party thereto). *But see In re Marriage of Paul*, 821 P.2d 925 (Colo.App.1991) (in dictum, it is asserted that the Act adopts the "entity theory of partnership").

While the Virginia courts have not directly addressed the question, the opinion in *McCormick v. Romans, supra*, is strong support for the proposition that a partnership is not an entity under Virginia law.

Referring to various provisions of the Act, the Virginia Supreme Court in *McCormick* held that there is no requirement that a partnership be named in a lawsuit involving that partnership, but that it is sufficient that all of the individual partners be named. This conclusion could not have been reached if the partnership itself was considered to be a separate legal entity.

■ We conclude, therefore, that under the Act as interpreted by both the Colorado and the Virginia courts, a general partnership is not a separate legal entity. It is, rather, an association of persons, either natural or artificial.

## IV. THE TRIAL COURT'S FINDINGS OF CONTEMPT

As noted, the trial court concluded that the law firm, as a partnership formed under Virginia law, was a separate legal entity which could not be represented in the Colorado courts by another person not admitted to practice before those courts. Because we conclude that this underlying premise was incorrect, we also conclude that that court's findings of contempt must be reconsidered by it in light of the foregoing discussion of the nature of a partnership.

Further, the court should also address the following subjects on remand.

### A. *The Partnership*

Although the trial court based its finding that Newell and Watt, the partners, and Joyce, the associate, were guilty of the unauthorized practice of law because they improperly represented the law firm, it also found that the partnership itself was likewise guilty of contemptuous conduct. However, it is not clear from the court's findings what "other" party the law firm sought to represent.

In light of our conclusion that the law firm does not have a separate existence, the trial court should consider whether, in light of its nature, a partnership, as an association of individuals, can be found to be in contempt.

### B. *The Partners*

■ Because a partnership has no separate existence and each partner is personally liable for the partnership's debts and other obligations, it is normally true that in any litigation affecting a partnership, any partner who is a natural person may appear in his or her own behalf. *See United States v. Reeves*, 431 F.2d 1187 (9th Cir. 1970). *See also Dial–A–Mattress Franchise Corp. v. Page*, 880 F.2d 675 (2d Cir. 1989) (although a corporation may not generally appear other than through counsel, if injunction is entered which restricts individual's actions, that individual may appear *pro se*). Thus, all of the partners may, collectively, represent the entire association. *See Knox Leasing v. Turner*, 132 N.H. 68, 562 A.2d 168 (1989).

Here, the personal liability of Newell and Watt, as well as the other partners, was directly implicated by the law firm's actions as escrow agent. Hence, there can be little question but that either of them could have appeared on his own behalf had he chosen to pursue the litigation on that basis.

Further, the appearance of the partners, purportedly on behalf of the entire partnership, was solely for the purpose of depositing funds with the court and of bringing before it all parties claiming an interest in those funds. Neither the partnership nor the individual partners claimed any right or interest in those funds, and neither of them sought to represent any other party who did claim such an interest.

Thus, neither the firm nor any of its members sought to advance or to defend the interest of any other party with respect to the *res* that was the subject of the interpleader complaint.

Given these circumstances, the court on remand should consider whether the actions of Newell or Watt constituted the practice of law within the meaning of the definition adopted by the supreme court in *Denver Bar Ass'n v. Public Utilities Commission, supra*.

Finally, even if such action might constitute unauthorized legal practice, in view of the fact that the law firm made no claim in

or to the funds and neither Watt nor Newell sought to represent any party who did make such a claim, the court should consider whether this is an instance in which their failure to expend funds to engage local counsel should, in the exercise of the court's sound discretion, be the basis for punitive contempt proceedings.

### C. *The Associate*

The name of Joyce, the associate, was typed on the initial complaint, but there is no direct testimony that he authorized his name to be added to that pleading. While he testified that he chose to become associated with the case because it was an interesting one, it is not clear when that choice was made.

Further, the trial court seems not to have based its findings of contempt upon the fact that Joyce's name was typed on the complaint. Rather, such finding appears to have been based upon the undisputed fact that, after the contempt citations were issued, Joyce signed a motion and legal memorandum seeking their withdrawal.

However, this action came after the issuance of the contempt citations. And, neither the motion for issuance of those citations, the affidavit in support, nor the citations themselves made any reference to this act. The sole contemptuous act described was the filing of "a pro se pleading in this case, to-wit: The Complaint in Interpleader."

Given these circumstances, therefore, the court should consider whether it has authority to find Joyce in contempt, based upon any act other than that described. *See People v. Razatos,* 699 P.2d 970 (Colo. 1985); *Wright v. District Court,* 192 Colo. 553, 561 P.2d 15 (1977).

### D. *The Penalty*

Finally, in view of the nature of the alleged contemptuous actions here, should the court again find any of the parties to be guilty of punitive contempt, it should consider whether it is appropriate in such a case to direct the payment of attorney fees to a party that is interested in the litiga-

tion. *See Marriage of Zebedee,* 778 P.2d 694 (Colo.App.1988); *Young v. United States ex rel. Vuitton Et Fils S.A.,* 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987).

### V.

In light of our disposition of this cause, we need not now consider the further assertions that the findings of contempt and the imposition of fines were too harsh a sanction.

The judgments of contempt are reversed, and the cause is remanded to the trial court for its further consideration in light of the comments set forth above.

JONES and DAVIDSON, JJ., concur.