UNITED STATES of America,
Plaintiff–Appellee,

v.

Paul N. CLAVETTE, Defendant–
Appellant.

No. 97–30119.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 3, 1997.

Decided Feb. 6, 1998.

Daniel Donovan, Assistant Federal De-
fender, Great Falls, Montana, for defendant-
appellant.

Lori Harper, Assistant United States Attorney, Missoula, Montana, for plaintiff-appellee.

Before: WRIGHT, REAVLEY * and KLEINFELD, Circuit Judges.

REAVLEY, Circuit Judge:

This is an appeal from the conviction of Paul Clavette for killing a grizzly bear in violation of the Endangered Species Act, 16 U.S.C. §§ 1538(a)(1)(G) and 1540(b)(1). We affirm.

## I. Background

On September 20, 1995, U.S. Fish and Wildlife Service Special Agent Tim Eicher began investigating the killing of a grizzly bear at a campsite southwest of Big Sky, Montana. At the campsite, Eicher discovered two pine trees with a pole suspended by rope between them. This was a "meat pole," used for stringing up and skinning large game animals. Underneath it, Eicher found traces of moose blood and hair, indicating that a moose had recently been dressed there. Eicher found the dead grizzly bear approximately 170 yards away, lying in a large pool of blood. The bear had been shot at least four times. Looking for bullets or spent shell casings, Eicher searched a conical area extending about 25 yards beyond the bear toward the campsite; he found one .7 mm casing by the meat pole and two bullets, one buried about two inches in the dirt at the base of a tree near the bear, and one on the surface of the ground next to the pool of the bear's blood.

Eicher located two bowhunters who had stopped at the campsite on September 17, 1995, to visit with an Oregon man skinning a freshly killed moose. The man seemed to be in a hurry and did not say anything about confronting or killing a grizzly. He did ask the bowhunters what would happen to someone who shot a grizzly bear. The bowhunters told him he had better be prepared to prove it was in self-defense.

Through these bowhunters and Montana hunting license records, Eicher identified the defendant, Paul Clavette, as the man at the campsite on September 17, 1995. Agents of the U.S. Fish and Wildlife Service in Portland, Oregon, obtained and executed a search warrant in defendant's home on November 2, 1995. During the course of that search, and after full *Miranda* warnings, Clavette admitted to killing the grizzly, claiming that it was in self-defense.

After a bench trial, the district court found Clavette guilty of illegally killing a grizzly bear. Clavette was sentenced to three years' probation. Additionally, Clavette was ordered to pay a fine of $2,000 and restitution of $6,250 to the United States Fish & Wildlife Service.

## II. Jury Trial

■ After being charged, Clavette requested a jury trial. Noting the Government's intention to seek a fine of $10,000 or less, the district court denied the motion. Clavette's entitlement to a jury trial is a question of law, reviewed *de novo*.[1]

■ The Supreme Court has held as a matter of constitutional law that "petty" offenses may be tried without a jury.[2] The test for determining whether a particular offense is "petty" is an objective one, focusing on the severity of the penalty authorized.[3] Any crime punishable by a prison sentence of more than six months is serious, triggering the Sixth Amendment right to trial by jury.[4] Any offense punishable by a prison term of six months or less is presumed to be petty.[5] This presumption may

---

* Honorable Thomas M. Reavley, Senior United States Circuit Judge for the United States Court of Appeals, Fifth Circuit, sitting by designation.

1. *Rife v. Godbehere,* 814 F.2d 563, 565 (9th Cir.), amended by 825 F.2d 185 (9th Cir.1987).

2. *Frank v. United States,* 395 U.S. 147, 148, 89 S.Ct. 1503, 1504–05, 23 L.Ed.2d 162 (1969).

3. *Id.*

4. *Baldwin v. New York,* 399 U.S. 66, 69, 90 S.Ct. 1886, 1888, 26 L.Ed.2d 437 (1970).

5. *Blanton v. City of North Las Vegas,* 489 U.S. 538, 542–43, 109 S.Ct. 1289, 1292–93, 103 L.Ed.2d 550 (1989).

be overcome if there are objective indications that the legislature regards the offense as serious.[6] The Supreme Court in *Blanton v. City of North Las Vegas* emphasized that the prison term was the central concern:

> Penalties such as probation or a fine may engender "a significant infringement of personal freedom," but they cannot approximate in severity the loss of liberty that a prison term entails. Indeed, because incarceration is an "intrinsically different" form of punishment, it is the most powerful indication whether an offense is "serious."[7]

The Court stated that a crime which carries a six month prison sentence will be classified as serious "only if [the defendant] can demonstrate that any additional statutory penalties, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they clearly reflect a legislative determination that the offense in question is a 'serious' one."[8] The Court felt that this would be a "rare situation."[9]

■ The maximum sentence allowed under the Endangered Species Act for violating § 1538(a)(1)(G) is six months in jail, a $25,000 fine or both.[10] The Government's agreement to seek a fine of no more than $10,000 is irrelevant to the question here. In classifying an offense as petty or serious, the Court looks only to the legislature's determination of the seriousness of the crime.[11]

The Supreme Court has only once found a crime with a prison sentence of six months or less to be serious. In that case, the fine was $52 million.[12] The Court stated that it "need not answer today the difficult question where the line between petty and serious contempt fines should be drawn."[13] The Court cited to both the statutory definition of "petty offenses" at 18 U.S.C. § 1(3)[14] and to an earlier case, *Muniz v. Hoffman*, in which the Court had stated that there was nothing "talismanic" about the statutory definition of petty offenses.[15]

Most recently, the Supreme Court, in *United States v. Nachtigal*, decided that an offense which carried a maximum penalty of six months imprisonment and a $5,000 fine, the limit of the current Congressional definition of "petty offenses," did not require a jury trial.[16] In holding that the offense was petty, the Court stated that this was a "routine" application of *Blanton*.[17] The Court discussed the size of the fine in relation to the $1,000 fine in *Blanton*, but did not mention the Congressional definition of "petty offenses."[18] The Court held that a $5,000 fine "cannot approximate in severity the loss of liberty that a prison term entails."[19] Following *Nachtigal*, two circuits have held that the addition of a $10,000 fine to a prison term of six months does not "clearly reflect a legislative determination that the offense in question is a 'serious' one."[20] We now hold that the addition of a $25,000 fine to a prison term of not more than six months does not reflect a clear Congressional determination that violation of an Interior Department regulation pertaining to endangered or threatened species is a serious offense. On the

---

**6.** *Id.* at 543, 109 S.Ct. at 1293.

**7.** *Id.* at 542, 109 S.Ct. at 1292 (citations omitted).

**8.** *Id.* at 543, 109 S.Ct. at 1293.

**9.** *Id.*

**10.** 16 U.S.C. § 1540(b)(1) (Supp.1997).

**11.** *Blanton*, 489 U.S. at 541–42, 109 S.Ct. at 1292–93.

**12.** *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 837 n. 5, 114 S.Ct. 2552, 2562 n. 5, 129 L.Ed.2d 642 (1994).

**13.** *Id.*

**14.** *Id.*

**15.** 422 U.S. 454, 477, 95 S.Ct. 2178, 2190–91, 45 L.Ed.2d 319 (1975).

**16.** 507 U.S. 1, 113 S.Ct. 1072, 122 L.Ed.2d 374 (1993) (per curiam).

**17.** *Id.* at 4, 113 S.Ct. at 1073–74.

**18.** *Id.* at 5, 113 S.Ct. at 1074.

**19.** *Id.* (quoting *Blanton*, 489 U.S. at 542, 109 S.Ct. at 1292).

**20.** *United States v. Soderna*, 82 F.3d 1370, 1378 (7th Cir.) (quoting *Blanton*, 489 U.S. at 543, 109 S.Ct. at 1293), *cert. denied*, —— U.S. ——, 117 S.Ct. 507, 136 L.Ed.2d 398 (1996); *United States v. Unterburger*, 97 F.3d 1413 (11th Cir.1996) (citing *Soderna*), *cert. denied*, —— U.S. ——, 117 S.Ct. 2517, 138 L.Ed.2d 1019 (1997).

contrary, the fact that Congress chose to impose a prison sentence of more than six months for all save one of the other violations of 16 U.S.C. § 1538 suggests that Congress specifically intended that violations of Interior Department regulations should be regarded as petty.[21]

## III. Sufficiency of the Evidence

■ Because Clavette moved to dismiss at the close of the Government's case-in-chief, the sufficiency of the evidence is reviewed *de novo*.[22] If any reasonable person could have found each of the essential elements of the offense charged beyond a reasonable doubt, the evidence is sufficient to convict.[23]

■ To find Clavette guilty of knowingly taking an endangered species, the Government must prove, beyond a reasonable doubt, that: (1) Clavette knowingly killed a bear; (2) the bear was a grizzly; (3) Clavette had no permit from the United States Fish & Wildlife Service to kill a grizzly bear; and (4) Clavette did not act in self-defense or in the defense of others. Pursuant to the regulations, a grizzly bear may be taken in self-defense or defense of others, but any such taking must be reported within five days to the U.S. Fish and Wildlife Service.[24]

■ There is no dispute that Clavette knowingly killed a grizzly bear without first obtaining a permit from the Fish & Wildlife Service. The only issue at trial was whether he acted in self-defense or in defense of his wife. Because Clavette presented evidence that he acted in self-defense, the Government must disprove self-defense beyond a reasonable doubt.[25]

■ Clavette and his wife changed their story multiple times. Clavette initially described his trip to Montana to Agent Earl Kisler as follows. Clavette said that as he was skinning a moose he had killed, he sensed something was wrong. He looked up and saw a seven- or eight-foot bear standing on its hind legs about 25 yards away from him, across a creek that ran past the campsite. He made noises to try to drive the bear away and fired a warning shot with his .7 mm rifle. Then, Clavette said, the bear began to circle the campsite, and Clavette was sure it was going to come forward. He told Kisler that he was terrified. Clavette's wife had retreated into the pickup truck. Clavette stated that when the bear was 40 to 75 yards away from the campsite, he shot it. The first shot hit the bear on the left side and appeared to paralyze its hindquarters, but it kept struggling, trying to get up, and so he emptied his rifle into it, reloaded, and fired more rounds into the bear.

Clavette later stated that there were two bears, although his wife still said that there had been one bear. Then, at trial, Clavette's wife testified that not only were there two bears, but that the second one charged her husband at a dead run. When asked why she had not mentioned two bears before, she explained that only one bear was shot. Clavette himself testified at trial that he had in fact told Agent Kisler about the second bear during their first discussion; Clavette surmised that it must have slipped their minds. He also testified that the second bear charged straight at him and that he crippled it with his first shot at 33 yards. Clavette said he saw the bear spin 180 degrees and dig with its front paws, trying to move away from him. The bear looked as if it was paralyzed in its hindquarters but actually ran another hundred yards away from him, without bleeding, so as to die in the spot where the bear was found by the agents.

Although he could not identify the order in which the shots occurred, Keith Aune, a wildlife laboratory supervisor for the Montana Department of Fish, Wildlife and Parks, tes-

---

**21.** *See also* 16 U.S.C. § 3 (limiting incarceration penalties for violation of Interior Department regulations to six months).

**22.** *United States v. Bahena–Cardenas,* 70 F.3d 1071, 1072 (9th Cir.1995).

**23.** *United States v. Jones,* 84 F.3d 1206, 1210 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 405, 136 L.Ed.2d 319 (1996).

**24.** 50 C.F.R. § 17.40(b)(i)(B) (1996).

**25.** *United States v. Keiser,* 57 F.3d 847, 851 n. 4 (9th Cir.), *cert. denied,* 516 U.S. 1029, 116 S.Ct. 676, 133 L.Ed.2d 525 (1995).

tified that the shots Clavette described were inconsistent with his own observations and measurements gathered during the necropsy. No entry wounds appeared on the head, chest or front legs, as would be expected if the bear had been approaching at high speed; all the entry wounds were in the rear portion. The stories were also inconsistent with the physical evidence found by Agent Eicher at the site.

Given the physical evidence and the inconsistencies in the Clavettes' stories, a reasonable person could have found beyond a reasonable doubt that Clavette had not killed the bear in self-defense.

AFFIRMED.