**The PEOPLE of the State of Colorado, Petitioner**

**v.**

**Suzanne SHELL, Respondent.**

**No. 04SA93.**

Supreme Court of Colorado, En Banc.

Dec. 18, 2006.

Office of Attorney Regulation Counsel, James C. Coyle, Deputy Regulation Counsel, Denver, Colorado, Attorney for Petitioner.

Paul Grant, Centennial, Colorado, Attorney for Respondent.

Justice EID delivered the Opinion of the Court.

This opinion considers the Presiding Disciplinary Judge's recommendation that we hold Respondent Suzanne Shell in contempt and fine her $6,000 for engaging in the unauthorized practice of law. We agree with the Presiding Disciplinary Judge and issue the contempt citation.

For the reasons explained below, we find that Shell has practiced law without a license in three separate legal proceedings since 2002, and in so doing, she has violated both Colorado law and a previous order entered by this court enjoining her against the unauthorized practice of law. Despite Shell's claims to the contrary, Colorado's ban on the unauthorized practice of law is constitutional and does not violate her rights under the First Amendment. We also disagree with Shell's assertions that she was entitled to a jury trial and that she has been deprived of due process because she was not provided with a free copy of a transcript of the proceedings below. While we fine Shell $6,000 for her unauthorized practice of law, we do not impose any additional amount for costs and attorneys' fees.

## I.

Suzanne Shell is an advocate committed to exposing what she considers to be abuses of process that occur in Colorado dependency and neglect cases. Shell is not a licensed attorney, however, and her advocacy previously has led her to cross the line between permissible activism and the unauthorized practice of law.

In May 2001, the Office of Attorney Regulation Counsel ("OARC") petitioned this court for an injunction and contempt citation against Shell. The OARC alleged that Shell engaged in the unauthorized practice of law by providing legal advice to parents involved in dependency and neglect cases, drafting pleadings for parents' use, and attempting to represent parents in judicial proceedings. Shell denied the OARC's allegations and claimed that she was entitled to provide legal advice and represent the parents because they had executed statutory powers of attorney authorizing her to act as their agent.

Shortly thereafter, Shell and the OARC entered into a "Stipulation" in which Shell agreed to the entry of an injunction preventing her from practicing law without a license in Colorado. Shell made several acknowledgments in the Stipulation, including (1) that she was familiar with Colorado law concerning the unauthorized practice of law, (2) that the "practice of law" includes activities such as offering legal advice and drafting or selecting legal documents for use by another person in a legal proceeding, and (3) that by

engaging in such activities without a license, Shell committed the unauthorized practice of law. Shell further acknowledged that she was incorrect in her belief that a statutory power of attorney allowed her to act as the signing party's legal representative. Shell agreed to pay administrative costs but the OARC did not pursue any fine for contempt.

This court entered an Order on October 25, 2001 (the "October 2001 Order"), accepting Shell's Stipulation and enjoining her against practicing law without a license in Colorado. The October 2001 Order incorporated Shell's Stipulation by reference.

Since the October 2001 Order was entered, Shell has been involved in two dependency and neglect proceedings in Colorado state courts and one civil action in the United States District Court for the District of Colorado. The OARC alleges that Shell engaged in the unauthorized practice of law in each of these cases, thereby violating Colorado law and our October 2001 Order.

*The K.M. Matter, 02JV97.* Shell participated in a Fremont County District Court action involving K.M., the mother of an allegedly dependent and neglected child. The court appointed attorney Daniel Kender to represent K.M. in May 2002.

Several months later, K.M. executed a statutory power of attorney providing Shell with broad powers to handle her affairs, including the power to act "in [her] stead regarding [her] Dependency and Neglect case." Shell contacted Kender in January 2003 and asked him to call her to discuss the K.M. matter. Kender testified to the hearing master below that he did not return Shell's call.

Shell subsequently sent a faxed letter to Kender dated February 21, 2003. In the letter, Shell informed Kender that she was acting as an "agent" for K.M. "based upon the Power of Attorney" executed several weeks before. Shell stated that "[K.M.'s] legal interests may not have been adequately represented" by Kender and that "drastic action is needed immediately to protect her rights to parent her children." Attached to the letter was a discovery request (specifically, a set of requests for admissions) directed to the caseworker assigned to the K.M. mat-

ter, the guardian ad litem, and the West Central Mental Health Center. Shell directed Kender to serve the discovery request "no later than next Tuesday," and explained that she "had great success using admissions in the past." Kender testified that he ignored Shell's letter and did not serve the discovery request.

In March 2003, K.M., acting pro se and without Kender's knowledge, served a discovery request on the caseworker, guardian ad litem, and West Central Mental Health Center. With the exception of very minor differences, the requests served by K.M. are identical to the requests attached to Shell's February 2003 letter to Kender. K.M. also filed a "Motion for Clarification of Effective Assistance of Counsel" in which she challenged Kender's representation of her interests in the dependency and neglect action. The district court struck K.M.'s pro se discovery request.

*The A.F. Matter, 03JV3.* While the K.M. matter was pending, Shell was involved in another dependency and neglect proceeding in Fremont County District Court, this one concerning A.F., a respondent mother. The court appointed Daniel Kender to represent A.F. A.F. subsequently executed a power of attorney authorizing Shell to act as her agent and giving Shell the power to handle her legal affairs.

As in the K.M. matter, Shell sent Kender a letter informing him that she had been engaged as an "expert consultant" by A.F. Shell advised Kender that her association with A.F. was confidential and was not to be revealed. Shell also gave Kender "information and instructions" on the defense of A.F., stating that she would provide Kender with "all the legal arguments and documentation" he might need, but admonished that they "will be useless" if Kender "fail[ed] to make the necessary arguments in court." Shell then instructed Kender to file specific documents and motions, make specific legal arguments and tender specific jury instructions. Shell also informed Kender that he should serve requests for admissions on the Department of Human Services, and directed Kender to her website to obtain a sample. Shell requested the opportunity to review the draft

discovery before it was served. Kender testified that he ignored Shell's letter.

As in the K.M. matter, A.F. filed and served pro se pleadings in her dependency and neglect action, each of which reveals a level of sophistication that is nearly impossible to attribute to A.F. given her lack of legal training. Kender was unaware that these pleadings had been filed and served by A.F. The substance and style of A.F.'s pleadings are strikingly similar to the language used in the pleadings filed in K.M.'s action, and with two trivial exceptions, A.F.'s "Motion for Clarification of Effective Assistance of Counsel" is identical to the same motion filed by K.M. in her action.

In April 2003, the Fremont County Department of Human Services requested that the trial court add Shell as a special respondent to the A.F. matter for the purpose of enjoining her against engaging in the unauthorized practice of law. Shell filed suit in federal court seeking an injunction preventing her from being added as a special respondent.

*The Federal Action, 03–RB–743.* Shell filed an action in the United States District Court for the District of Colorado pursuant to 18 U.S.C. section 1983 alleging that her civil rights—and those of A.F.—had been violated by eight defendants, including the Fremont County District Court and A.F.'s attorney, Daniel Kender (the "Federal Action"). Both Shell and A.F. were named as plaintiffs, with Shell purporting to represent A.F. in the case. The federal magistrate assigned to the case entered an order on May 14, 2003, holding that Shell "cannot represent [A.F.] in this matter, nor may [Shell] sign pleadings, motions, or other documents in this case on [A.F.'s] behalf." The magistrate ordered A.F. to sign the complaint as a pro se plaintiff.

Shell—again acting on behalf of A.F.—filed a motion to reconsider, arguing that the statutory power of attorney executed by A.F. authorized Shell to act as A.F.'s legal representative. The district court denied Shell's motion to reconsider. Subsequently, the court dismissed the Federal Action for lack of subject-matter jurisdiction and failure to state a claim for relief.

*The Proceedings Below.* In March 2004, the OARC petitioned this court to hold Shell in contempt for violating the October 2001 Order and Colorado law prohibiting the unauthorized practice of law. The OARC cited Shell's activities in the K.M. matter, the A.F. matter, and the Federal Action to support its petition.

The Presiding Disciplinary Judge, acting as a hearing master, held a hearing on the OARC's petition and considered evidence and testimony presented by both sides. Shell videotaped the proceedings in their entirety.

Shell argued to the hearing master that there was no direct evidence that she prepared the pleadings and discovery requests filed and served pro se by K.M. and A.F., or that she otherwise provided the respondent mothers with legal advice. To support her claim, Shell offered the testimony of K.M.'s mother's boyfriend and A.F.'s mother. These relatives testified that they prepared the pleadings and discovery requests based on their research of various internet websites, and that Shell neither selected the documents nor advised the mothers to file them.

The hearing master concluded that the relatives' testimony was not credible in light of the surrounding circumstantial evidence presented by the OARC. First, the hearing master found that it was virtually impossible for K.M. and A.F. to have prepared their pleadings without assistance, given their lack of legal training. Second, the hearing master found implausible the notion that relatives of two separate mothers involved in two separate proceedings would draft virtually identical pleadings and discovery requests. Aside from Kender, who did not know about the pro se filings until after they were served, the only connection between K.M. and A.F. was Suzanne Shell.

In addition, both proceedings contained the same sequence of events arising from Shell's involvement as the mothers' representative. In both cases, Shell sent a letter to Kender purporting to act as the mothers' agent and instructing Kender to take specific legal measures. In both cases, Kender ignored Shell's letter. And in both cases, Ken-

der's refusal to follow Shell's instructions led to the mother filing pro se pleadings and serving pro se discovery requests. Not only were these pro se documents virtually identical, but their substance mirrored the arguments and instructions contained in Shell's letters to Kender. Shell's communications to Kender, and the subsequent pattern of events that stemmed from those communications, led the hearing master to conclude that Shell prepared or selected the pleadings and discovery requests and advised the mothers, either directly or by using the mothers' relatives as conduits for her legal advice, to file and serve them pro se.

Based on its findings, the hearing master recommended to this court that Shell be found in contempt and fined $6,000. The hearing master also recommended that Shell be assessed an additional $5,409 for legal costs and the OARC's attorneys' fees. Shell appealed the hearing master's recommendations.

Prior to filing her opening brief in this appeal, Shell requested a transcript of the proceedings below, to be paid for at state expense. Shell argued that indigence prevented her from paying for the transcript. This court denied Shell's motion.

In this appeal, Shell offers several reasons for why the court should not accept the hearing master's recommendation, and we consider them in turn.

Section II addresses Shell's claim that the evidence presented below was inadequate to support the hearing master's finding that she engaged in the unauthorized practice of law. As we explain, the evidence in the record sufficiently supports the hearing master's findings that Shell offered legal advice, drafted legal pleadings and attempted to represent another person in a judicial proceeding, all of which constitute the practice of law.

In section III, we address Shell's defenses against the enforcement of Colorado's ban on the unauthorized practice of law against her in this action. In particular, Shell claims that the ban is unconstitutionally vague and violates the First Amendment. Shell further contends that the court lacks jurisdiction to punish the unauthorized practice of law in

federal courts, and that therefore we cannot hold her in contempt for attempting to represent A.F. in the Federal Action. Shell also urges that the statutory powers of attorney executed by K.M. and A.F. authorized her to act as the mothers' legal representative. We disagree with Shell on each count.

In section IV of our opinion, we consider Shell's claim that her right to a jury trial was violated in this case. We hold that Shell was not entitled to a jury trial because the recommended fine is not sufficiently serious to trigger Shell's constitutional right to a jury trial, and because Shell has no independent right to a jury trial under a Colorado statute.

Section V of the opinion addresses Shell's assertion that her right to due process was violated because she was denied a transcript of the proceedings below for use in this appeal. We find that any error resulting from the failure to provide Shell with a transcript was harmless because it did not impact this court's ability to consider the issues raised in Shell's appeal.

Finally, in section VI, we explain why Shell cannot be assessed costs and attorneys' fees as a result of the contempt proceeding. Consequently, we adopt the hearing master's recommendation as to the citation of contempt and the imposition of a $6,000 fine, but decline to follow that recommendation with respect to costs and attorneys' fees.

## II.

### A.

■■■ Colorado law prohibits the unauthorized practice of law, i.e., the practice of law by a person who is not a licensed attorney in good standing with the State Bar. *See Unauthorized Practice of Law Comm. v. Grimes*, 654 P.2d 822, 823 (Colo.1982). This court has the exclusive authority to punish the unauthorized practice of law with contempt. *See id.* Where an individual previously has been enjoined by the court against practicing law without a license, violations of that injunction are punishable in contempt proceedings conducted pursuant to C.R.C.P.

107.[1] *Cf. Austin v. City & County of Denver,* 156 Colo. 180, 184, 397 P.2d 743, 745 (1964) ("The power to punish for contempt, as a punitive measure or to coerce obedience, is an inherent and indispensable power of the courts.").

We previously have defined the "practice of law" as acting "in a representative capacity in protecting, enforcing, or defending the legal rights and duties of another and in counselling, advising and assisting him in connection with these rights and duties . . . ." *Denver Bar Ass'n v. Pub. Util. Comm'n,* 154 Colo. 273, 279, 391 P.2d 467, 471 (1964). Applying this definition, we have held that an unlicensed person engages in the unauthorized practice of law by offering legal advice about a specific case, drafting or selecting legal pleadings for another's use in a judicial proceeding without the supervision of an attorney, or holding oneself out as the representative of another in a legal action. *See id.; see also Grimes,* 654 P.2d at 823 (offering case-specific legal advice and selecting case-specific legal documents constitutes the practice of law); *Unauthorized Practice of Law Comm. v. Prog,* 761 P.2d 1111, 1115 (Colo.1988) (same).

As we explained in *Grimes,* we have attempted to avoid any doubt about the activities that constitute the "practice of law" by enacting C.R.C.P. 201.3, which provides a thorough "definition of what constitutes the practice of law which is supported by long-standing case authority. . . ." 654 P.2d at 824 n. 1. That definition includes "[f]urnishing legal counsel, drafting documents and pleadings, and interpreting and giving advice with respect to the law," as well as "presenting cases before courts. . . ." C.R.C.P. 201.3(2)(b)(i) & (ii).

### B.

Applying the standard set forth above, the hearing master found that Shell engaged in the unauthorized practice of law by sending letters to Kender directing him to follow her legal advice. The hearing master also found that Shell had advised K.M. and A.F. to file and serve their pleadings and discovery requests without the knowledge or approval of Kender, and that Shell was instrumental in preparing or selecting those pleadings and discovery. This, too, constituted the unauthorized practice of law. Finally, the hearing master found that Shell engaged in the unauthorized practice of law by attempting to represent A.F. in the Federal Action.

■ We accept the hearing master's findings of fact unless they are so clearly erroneous as not to find support in the record. *See Page v. Clark,* 197 Colo. 306, 313, 592 P.2d 792, 796 (1979). Our consideration of the record reveals that the hearing master's findings were not clearly erroneous, and we defer to the hearing master's resolution of the conflicting facts in evidence.

■ The record sufficiently supports the finding that Shell engaged in the unauthorized practice of law in the K.M. and A.F. matters. These cases followed a remarkably similar pattern. In both cases, Shell wrote letters to the mothers' attorney instructing him to take specific legal measures. In both cases, once Shell's instructions were ignored, the mothers filed and served pro se pleadings and discovery requests without the knowledge or approval of their attorney. The hearing master reasonably concluded that these legal documents were the direct result of Shell's involvement. As the hearing master found, it was impossible for K.M. and A.F. to have prepared their pleadings and discovery requests without the assistance of someone with legal experience in dependency and neglect cases. It also defied reason that K.M. (or her family) would prepare pleadings and discovery requests that were nearly

---

1. Shell argues in passing that the proceedings below were constitutionally insufficient. We find her claim meritless. Rule 107 entitles the alleged contemnor to notice of the charges and an opportunity to respond at a trial on the merits by cross-examining adverse witnesses and by presenting evidence and witnesses of her own. *See* C.R.C.P. 107(d)(1). Shell received the full panoply of these protections in the proceedings below,

consistent with the demands of due process. *See Harris v. United States,* 382 U.S. 162, 166 n. 4, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965) ("Due process of law . . . in the prosecution of contempt, except of that committed in open court, requires that the accused should be advised of the charges and have a reasonable opportunity to meet them by way of defense or explanation." (citation omitted)).

identical to pleadings and discovery requests prepared by A.F. (or her family). Not only were the documents filed by K.M. and A.F. nearly identical, but they incorporated many of the legal arguments that Shell separately provided to Kender in her letters. The only connection between K.M. and A.F. other than their common attorney, who had no knowledge of his clients' pro se filings, was Shell. In light of this record, the hearing master reasonably concluded that Shell was providing legal advice to K.M. and A.F. and was drafting legal documents for their use.

We acknowledge that conflicting evidence was presented to the hearing master regarding Shell's contact with K.M. and A.F. Specifically, family members of K.M. and A.F. testified that Shell had no involvement in drafting the pleadings and discovery requests that the mothers filed pro se. These family members testified that they prepared the legal documents based principally upon internet research. The hearing master, however, concluded that the family members' testimony was simply incredible given the unlikelihood that two separate families would prepare legal documents that were virtually identical both to one another and to the advice that Shell provided to Kender in her letters. Since there is sufficient evidence in the record refuting the family members' testimony, we defer to the hearing master's factual conclusion that Shell did in fact provide legal advice to K.M. and A.F. and draft legal pleadings and discovery requests for their use. *See Page,* 197 Colo. at 313, 592 P.2d at 796. Providing legal advice to K.M. and A.F. and preparing legal documents for use in their dependency and neglect proceedings constituted the unauthorized practice of law. *See* C.R.C.P. 201.3(2)(b)(i); *Prog,* 761 P.2d at 1115.

▇ Beyond Shell's involvement in the two dependency and neglect proceedings, there is no question that Shell filed the Federal Action on behalf of herself and A.F., and that she subsequently filed a motion asserting her right to prosecute A.F.'s claims in the Federal Action. Drafting and filing a legal pleading on behalf of another person and without a license is clearly the unauthorized practice of law. *See* C.R.C.P. 201.3(2)(b)(i) & (ii).

Our review of the record reveals no reason to disturb the hearing master's factual findings that Shell engaged in the unauthorized practice of law. These facts having been established, we now turn to considering Shell's challenge to the enforcement of the ban against her in this case.

## III.

### A.

Shell claims that Colorado's ban on the unauthorized practice of law violates her right to due process because it is unconstitutionally vague, both on its face and as applied to her in this case. We disagree.

▇ The vagueness doctrine is rooted in the right to due process of law, which requires that a law provide "fair notice of the conduct that has been determined to be unlawful." *Smith v. Charnes,* 728 P.2d 1287, 1290 (Colo.1986). Thus a law offends due process if "it does not provide fair warning of the conduct prohibited or if its standards are so ill-defined as to create a danger of arbitrary and capricious enforcement." *Parrish v. Lamm,* 758 P.2d 1356, 1367 (Colo.1988). Under this standard, a law "is not void for vagueness if it fairly describes the conduct forbidden, and persons of common intelligence can readily understand its meaning and application." *Id.* Shell bears the burden of establishing the unconstitutional vagueness of our ban on the unauthorized practice of law beyond a reasonable doubt. *See People v. Baer,* 973 P.2d 1225, 1230 (Colo.1999).

▇ Furthermore, for Shell to succeed on her challenge that the ban is *facially* void for vagueness, she must show that it is incomprehensible in all of its applications. *See People ex rel. City of Arvada v. Nissen,* 650 P.2d 547, 550 (Colo.1982). Shell's claim immediately fails this test, because C.R.C.P. 201.3(2)(b) unambiguously defines the practice of law to include "drafting documents and pleadings," "giving advice with respect to the law," and "presenting cases before courts"—in other words, exactly the activities in which Shell engaged in the K.M. matter, the A.F. matter, and the Federal Action. The activities delineated in C.R.C.P. 201.3

were not pulled from thin air, but were grounded in prior decisions of this court describing the nature of the practice of law. *See Grimes*, 654 P.2d at 824 n. 1 (explaining that the definition of "practice of law" in C.R.C.P. 201.3 is "supported by longstanding case authority"). We believe that the activities described in Rule 201.3 and our controlling caselaw are specific enough to provide a person of common intelligence with notice of what activities constitute the practice of law, and thus the ban on the unauthorized practice of law is not facially void for vagueness. *See People v. Hickman*, 988 P.2d 628, 644 (Colo.1999) (rejecting facial vagueness challenge where law was "sufficiently specific to provide the constitutionally required guidance to individuals seeking to comply with the law...").

 Shell's claim that our ban is unconstitutionally vague as applied to her similarly fails. To prevail, Shell must show that the ban on the unauthorized practice of law "does not, with sufficient clarity, prohibit the conduct against which it is enforced." *People v. McIntier*, 134 P.3d 467, 475 (Colo.App. 2005). The clarity of the ban is viewed in light of Shell's knowledge that her conduct was prohibited. *See Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). In 2001, Shell expressly stated that she understood that our ban forbids drafting legal pleadings, providing legal advice, and attempting to represent another person in a legal proceeding without a license. These are the very activities in which Shell engaged in the K.M. matter, the A.F. matter, and the Federal Action, and thus she cannot claim that Colorado law is void for vagueness as applied to her. *See id.*

**B.**

Shell also claims that her actions were permissible exercises of her First Amendment freedom of speech and freedom to petition the government for a redress of grievances. We reach a different conclusion.

 In general, Colorado's ban on the unauthorized practice of law does not implicate the First Amendment because it is directed at *conduct*, not *speech*. *See Ohralik v.*

*Ohio State Bar Ass'n*, 436 U.S. 447, 456, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978) (suggesting that the government's regulation of the practice of law is a regulation of conduct, not speech); *S. Christian Leadership Conference v. Sup.Ct. of La.*, 252 F.3d 781, 789 (5th Cir.2001) (finding that state prohibition on unlicensed students practicing law in state courts did not regulate speech); *Drew v. Unauthorized Practice of Law Comm.*, 970 S.W.2d 152, 155 (Tex.App.1998) (holding that ban on unauthorized practice of law did not implicate the First Amendment); *Fla. Bar v. Furman*, 376 So.2d 378, 379 (Fla.1979) (rejecting argument from unlicensed attorney that ban on unauthorized practice of law violated freedom of speech).

 The fact that our ban touches on the legal content of the advice offered or the pleadings drafted by an unlicensed person is of no constitutional significance, since "it has never been deemed an abridgement of freedom of speech or press to make a *course of conduct* illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949) (emphasis added); *see also Ohralik*, 436 U.S. at 456, 98 S.Ct. 1912 (applying *Giboney* in the context of attorney regulation case). In this respect, our ban on the unauthorized practice of law is no different from state laws prohibiting bribery (section 18–8–302, C.R.S. (2006)), extortion (section 18–3–207, C.R.S. (2006)), or criminal solicitation (section 18–2–301, C.R.S. (2006)). Each of these unlawful activities requires some method of communication, and yet it is "well established that speech which, in its effect, is tantamount to legitimately proscribable nonexpressive conduct may itself be legitimately proscribed, punished, or regulated incidentally to the constitutional enforcement of generally applicable statutes." *Rice v. Paladin Enter., Inc.*, 128 F.3d 233, 243 (4th Cir.1997) (citing *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991)).

 It is true that some activities constituting the practice of law are difficult to disentangle from the exercise of free speech.

*See Lawline v. Am. Bar Ass'n,* 956 F.2d 1378, 1386 (7th Cir.1992) ("While the practice of law and the exercise of free speech are not indistinguishable, neither are they mutually exclusive."). However, none of Shell's actions at issue in this case presents such a difficulty. Any impact on speech in this case "is merely the incidental effect of observing an otherwise legitimate regulation." *Id.*

We also find no basis for Shell's claim that our ban is an unconstitutional abridgement of her right to petition the government for a redress of grievances. As we held in *Grimes,* the First Amendment right to file a lawsuit does not extend to filing a lawsuit on behalf of another, nor does it prohibit the state from restricting legal representation to licensed attorneys. *See* 654 P.2d at 824; *see also Turner v. Am. Bar Ass'n,* 407 F.Supp. 451, 478 (D.Ala.1975) (rejecting claim that individual has right to legal representation by an unlicensed attorney based on the right to petition for redress of grievances); *Lawline v. Am. Bar Ass'n,* 738 F.Supp. 288, 296 (N.D.Ill.1990), *aff'd* 956 F.2d 1378 (7th Cir. 1992) (applying *Turner*). Shell offers no legal authority that persuades us to revisit our decision in *Grimes,* and therefore, her First Amendment challenge lacks merit.

The court also is unpersuaded by Shell's claim that the ban on the unauthorized practice of law is unconstitutionally overbroad. The overbreadth doctrine arises from the concern that a law's scope may be so broad that it either restricts speech protected by the First Amendment or has a chilling effect on such speech. *See People v. Shepard,* 983 P.2d 1, 3 (Colo.1999). The alleged overbreadth "must be real and substantial, judged in relation to the statute's plainly legitimate sweep." *Id.*

As this case reveals, one of the touchstones of Colorado's ban on the unauthorized practice of law is an unlicensed person offering advice or judgment about legal matters to another person for use in a specific legal setting. *See Denver Bar Ass'n,* 154 Colo. at 280, 391 P.2d at 471. The ban's focus on case-specific legal practice keeps it from becoming so malleable as to restrict Shell's right to criticize legal rulings or advocate for the reform of Colorado's legal sys-

tem. Any potential limitation on protected speech or conduct caused by the ban "is not real and substantial as compared" to the legitimate and permissible ban on the unauthorized practice of law, which concerns "a whole range of easily identifiable and constitutionally proscribable conduct." *Shepard,* 983 P.2d at 4. We therefore cannot agree with Shell's claim of overbreadth.

### C.

We also are unpersuaded by Shell's assertion that the court lacks jurisdiction to sanction her for practicing law without a license in federal court.

This court has the authority "to regulate and control the practice of law in Colorado," *Grimes,* 654 P.2d at 823, and to that end, we previously have punished violations of the professional rules of conduct committed in federal court proceedings. *See People v. Heyer,* 176 Colo. 188, 489 P.2d 1042 (1971) (sanctioning attorney for violations of rules of conduct in Colorado federal court). Other states have acted similarly. *See, e.g., Disciplinary Counsel v. Givens,* 106 Ohio St.3d 144, 832 N.E.2d 1200, 1201 (2005) ("[W]e are also authorized to enjoin the unauthorized practice of law before federal courts located in this state."); *Kennedy v. Bar Ass'n of Montgomery County, Inc.,* 316 Md. 646, 561 A.2d 200, 208–09 (1989) (holding that state court could regulate the practice of law in federal courts located in the state); *State ex rel. Disciplinary Comm'n v. Crofts,* 500 N.E.2d 753, 756 (Ind.1986) (same). In keeping with these decisions and our mandate to regulate the practice of law in Colorado, we construe our ban on the unauthorized practice of law to include the practice of law in Colorado federal courts.

It is certainly true that the Colorado federal courts can allow individuals to engage in legal practice in federal courts who would not otherwise be allowed to practice law in Colorado state courts. *See Sperry v. Florida ex rel. Fla. Bar,* 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963) (holding that, under the Supremacy Clause, a state court could not enforce a prohibition on the unauthorized

practice of law against an individual who was permitted to practice law under the rules of a federal court located in the state's jurisdiction). Nevertheless, the Supreme Court made clear in *Sperry* that "the State maintains control over the practice of law within its borders except to the limited extent necessary for the accomplishment of . . . federal objectives." *Id.* at 402, 83 S.Ct. 1322.

There are no such "federal objectives" in this case. The United States District Court for the District of Colorado, the federal court in which Shell filed the Federal Action on behalf of A.F., restricts the practice of law to those individuals who are "licensed by the highest court of a state, federal territory, or the District of Columbia where a written examination was required for admission. . . ." D.C.Colo.LCivR 83.3(A); *see also* D.C.Colo. LCivR 11.1(A) ("Only pro se individual parties and members of this court's bar may appear or sign pleadings, motions, or other papers."). Shell does not meet this standard for practice in the Colorado federal district court because she is not licensed as an attorney in any state or territory. In the absence of preemption by the federal courts, this court has the power to sanction Shell for her unauthorized practice of law in the Federal Action.

### D.

 Shell asserts that the statutory powers of attorney executed by K.M. and A.F. authorized her to act as the mothers' legal representative in their dependency and neglect proceedings. However, Shell acknowledged in her 2001 Stipulation with the OARC that a statutory power of attorney did not give her the ability to practice law without a license. The doctrine of judicial estoppel binds Shell to her previous acknowledgment that a power of attorney is not a proxy for a law license. *See Estate of Burford v. Burford*, 935 P.2d 943, 947 (Colo.1997) (explaining judicial estoppel). Judicial estoppel is "an equitable doctrine by which courts require parties to maintain a consistency of positions," thereby "preventing the parties from deliberately shifting positions to suit the exigencies of the moment." *Id.*

Under this doctrine, Shell cannot contradict her acknowledgment in her 2001 Stipulation that statutory powers of attorney do not allow her to practice law. *See Leonia Bank v. Kouri*, 3 A.D.3d 213, 772 N.Y.S.2d 251, 255–56 (N.Y.App.Div.2004) (holding that stipulation precluded litigant from asserting contrary position in subsequent case); *see also Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir.2003) (explaining that litigant could not assert position inconsistent with one taken in previous proceeding, even though the previous proceeding did not amount to an adjudication of the issue); *In re Adoption of S.A.J.*, 575 Pa. 624, 838 A.2d 616, 621 (2003) (same). Thus judicial estoppel prevents Shell from resurrecting an argument that she previously acknowledged was incorrect. *See Scarano v. Cent. R.R. Co.*, 203 F.2d 510, 513 (3d Cir.1953) (applying judicial estoppel doctrine) (quoted in *Estate of Burford*, 935 P.2d at 947).

\* \* \*

To summarize, Colorado's ban on the unauthorized practice of law is not vague and does not violate the First Amendment. We also hold that, in this case, our ban extends not only to Shell's unauthorized practice of law in state courts, but also to her unauthorized practice of law in the Federal Action. Finally, Shell cannot claim to have relied on the statutory powers of attorney executed by K.M. and A.F., because she previously has acknowledged in a written stipulation with the OARC (incorporated by reference in the October 2001 Order) that such statutory powers of attorney do not allow her to act as an attorney at law. We next consider whether Shell should have received a jury trial on the OARC's petition for contempt.

### IV.

Shell contends that she was entitled to a jury trial under the Federal and State Constitutions and section 16–10–101, C.R.S. (2006). We hold otherwise.

### A.

 Section 16–10–101 provides, in relevant part:

The right of a person who is accused *of an offense* other than a noncriminal traffic infraction or offense, or other than a municipal charter, municipal ordinance, or county ordinance violation ... to have a trial by jury is inviolate....

(emphasis added). Shell argues that the plain language of section 16–10–101 entitles her to a jury trial on the OARC's contempt petition. This argument, however, ignores the definition of the term "offense" used in the statute.

An "offense," as used in section 16–10–101, has been defined by the General Assembly as "a violation of ... any *state statute* for which a fine or imprisonment may be imposed." § 18–1–104(1), C.R.S. (2006) (emphasis added). By its plain terms, therefore, section 16–10–101 extends a statutory right to a jury trial only to violations of state statutes. Contempt, of course, is not a statutory offense, but instead is "an inherent and indispensable power of the court and exists independently of legislative authorization." *People v. Barron*, 677 P.2d 1370, 1372 (Colo.1984). The General Assembly recognized this distinction when it abolished all common-law crimes in Colorado, but simultaneously noted that such abolition "does not affect the power of a court to punish for contempt...." § 18–1–104(3). Thus the plain language of section 16–10–101 relates only to offenses properly classified as crimes defined by statute, not to contempt charges, and Shell has no right to a jury trial on the OARC's contempt allegation under the statute.[2]

### B.

▮ Having rejected Shell's statutory claim, we turn to her argument that the Federal and State Constitutions guarantee her a jury trial. *See* U.S. Const. amend. VI ("In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury...."); Colo. Const. art. II, § 16 ("In criminal prosecutions the accused shall have the right to ... a speedy public trial by an impartial jury...."). The constitutional guarantee of a jury trial in criminal cases does not extend to non-serious or "petty" offenses. *See Duncan v. Louisiana*, 391 U.S. 145, 158, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); *Austin v. City & County of Denver*, 170 Colo. 448, 456, 462 P.2d 600, 604 (1969). In the same vein, the right to a jury trial equally applies to serious contempt charges, but not to non-serious or "petty" contempt charges. *See Taylor v. Hayes*, 418 U.S. 488, 495, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974).

▮ To determine whether an offense should be characterized as "serious" or "petty," we first look for "objective indications of the seriousness with which society regards the offense." *Lewis v. United States*, 518 U.S. 322, 325, 116 S.Ct. 2163, 135 L.Ed.2d 590 (1996) (quoting *Frank v. United States*, 395 U.S. 147, 148, 89 S.Ct. 1503, 23 L.Ed.2d 162 (1969)). These "objective indications" often are found in the "legislature's judgment about the offense's severity," whether in the legislature's explicit designation of an offense as serious or petty or in "the maximum penalty attached to the offense...." *Lewis*, 518 U.S. at 326, 116 S.Ct. 2163. In Colorado, the General Assembly has designated a category of criminal actions as "petty offenses" that are separate from misdemeanors and felonies and carry a maximum fine of $500. *See* § 18–1.3–503, C.R.S. (2006). We have held that the legislature's categorization of "petty offenses" is an objective indication that the legislature generally considers misdemeanors and felonies to be "serious" offenses that must be tried to a jury. *See Christie v. People*, 837 P.2d 1237, 1241 (Colo.1992) (holding that a criminal offense carrying a maximum punishment in excess of $500 requires trial to a jury); *Austin*, 170 Colo. at 456, 462 P.2d at 604 (same).

The "objective indications" that we followed in *Christie* and *Austin* and applied to statutory offenses are unavailable to us in this case because the General Assembly has not classified contempt as either "petty" or "serious" in the Colorado statutes, and contempt does not carry a legislatively deter-

**2.** The court of appeals reached the same conclusion in *Kourlis v. Port*, 18 P.3d 770 (Colo.App. 2000).

mined sentence. For this reason, the categories of criminal offenses created by the General Assembly—and their attendant maximum penalties—are not applicable to contempt charges.

■ In the absence of an "objective indication" from the legislature, the determinant of whether a particular contempt charge is sufficiently serious to require a jury trial is the severity of the fine actually imposed upon the contemnor. *See Frank*, 395 U.S. at 151, 89 S.Ct. 1503. The United States Supreme Court "has not specified what magnitude of contempt fine may constitute a serious criminal sanction" for purposes of the Sixth Amendment, but it has held that contempt fines of $5,000 for individuals, and $10,000 for non-individuals such as corporations, are presumptively "petty" and do not require a jury trial. *See Int'l Union, UMW of Am. v. Bagwell*, 512 U.S. 821, 837 n. 5, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994).

■ Shell argues that the hearing master's recommendation of a $6,000 fine for contempt exceeds the $5,000 threshold and entitles her to a jury trial. We disagree. The Supreme Court has made clear that $5,000 carries no "talismanic significance," and that the critical question remains whether the fine imposed is "of such magnitude" that a jury trial is warranted. *Muniz v. Hoffman*, 422 U.S. 454, 477, 95 S.Ct. 2178, 45 L.Ed.2d 319 (1975). Shell offers no explanation for why a $6,000 fine, rather than a $5,000 fine, is of "such magnitude" that it should entitle her to a jury trial under this criterion. We agree with the opinions of other courts that have held that fines in excess of $5,000—so long as they are reasonable—do not give rise to a constitutional right to a trial by jury. *See United States v. Clavette*, 135 F.3d 1308, 1309–10 (9th Cir. 1998) (holding that $25,000 fine did not trigger defendant's constitutional right to a jury trial); *United States v. Unterburger*, 97 F.3d 1413, 1416 (11th Cir.1996) (holding that fine of $10,000 was not sufficiently serious to trigger the defendant's jury trial right). While we take no position on whether the courts in *Clavette* or *Unterburger* were correct that fines of $25,000 or $10,000, respectively, are petty, we agree with the reasoning of these decisions that $5,000 is not talismanic. Applying this principle, we find that the hearing master's recommendation of a $6,000 fine for contempt in this case is petty such that it does not trigger Shell's constitutional right to a jury trial.

## V.

Shell contends that she is entitled to a new hearing on the OARC's contempt petition because she was not provided with a copy of the transcript from the proceedings below. This court denied Shell's petition for a transcript at state expense.

■ Upon an adequate showing of economic hardship, "destitute defendants must be afforded as adequate [an] appellate review as defendants who have money enough to buy transcripts." *Jurgevich v. Dist. Court*, 907 P.2d 565, 567 (Colo.1995) (quoting *Griffin v. Illinois*, 351 U.S. 12, 19, 76 S.Ct. 585, 100 L.Ed. 891 (1956)). Consequently, "the state must provide either a free transcript or other means of affording adequate and effective appellate review to indigent defendants." *Id.* The failure to provide an indigent defendant with a transcript is reversible error only if it prevents the appellate court from adequately reviewing the issues raised by the defendant on appeal. *See People v. Shearer*, 181 Colo. 237, 242, 508 P.2d 1249, 1252 (1973).

■ The OARC argues that there is no error because Shell failed to adequately demonstrate that she was indigent. We need not reach this issue, however, because Shell has not been harmed by the lack of a transcript. Shell videotaped the entire proceedings before the hearing master, and was able to provide this court with citations to the videotapes of the hearing. The court had the opportunity to review the video recordings to the extent necessary to consider the issues raised in Shell's appeal. Since we were able to adequately consider the issues raised by Shell on appeal, she is not entitled to a new hearing. *See id.* at 242, 508 P.2d at 1252.

## VI.

Finally, Shell argues that the hearing master erroneously recommended that this court

award costs and attorneys' fees to the OARC as part of the contempt citation. We agree with Shell and decline to adopt the hearing master's recommendation as to costs and attorneys' fees.

Rule 107 of the Colorado Rules of Civil Procedure recognizes two types of sanctions for contempt of court: "remedial sanctions," which are imposed "to force compliance with a lawful order or to compel performance of an act within the person's power or present ability to perform," C.R.C.P. 107(a)(5), and "punitive sanctions," which are imposed as "[p]unishment by unconditional fine, fixed sentence of imprisonment, or both, for conduct that is found to be offensive to the authority and dignity of the court," C.R.C.P. 107(a)(4). Rule 107(d)(2) permits the assessment of costs and attorneys' fees where remedial sanctions are imposed against a contemnor. In contrast, the provisions relating to punitive contempt sanctions do not authorize the assessment of costs and attorneys' fees. See C.R.C.P. 107(d)(1).

We interpret rules of procedure consistent with principles of statutory construction. See Leaffer v. Zarlengo, 44 P.3d 1072, 1078 n. 6 (Colo.2002). These principles teach that words or provisions should not be added to a rule, see People v. Cross, 127 P.3d 71, 73 (Colo.2006), and that the inclusion of certain terms in a rule implies the exclusion of others, see Zab, Inc. v. Berenergy Corp., 136 P.3d 252, 261 (Colo.2006) (Eid, J., concurring). Applying these principles, we hold that costs and fees cannot be assessed when the court imposes punitive sanctions against a contemnor, because C.R.C.P. 107(d)(1) does not expressly authorize their assessment. We find the rule's silence dispositive in light of the language in C.R.C.P. 107(d)(2) permitting the assessment of costs and fees when a remedial sanction is imposed. See In re Lopez, 109 P.3d 1021 (Colo.App.2004) (holding that costs and fees cannot be assessed when a court imposes punitive sanctions); Eichhorn v. Kelley, 56 P.3d 124 (Colo.App. 2002) (same).

The sanction for contempt recommended by the hearing master in this case clearly is punitive—not remedial—in nature. Shell is not given the choice of accepting the $6,000 fine or complying with the court's October 2001 Order, and such a choice is indispensable in order for the sanction to be remedial. See C.R.C.P. 107(a)(5) (explaining that remedial sanctions are imposed to compel compliance); C.R.C.P. 107(d)(2) (stating that remedial sanctions must be accompanied by a written order explaining how the contemnor "may purge the contempt and the sanctions" through compliance). Since the recommended sanction against Shell is punitive, costs and attorneys' fees cannot be awarded. See C.R.C.P. 107(d)(1). We agree with Shell and we do not assess costs and attorneys' fees.

## VII.

Suzanne Shell has engaged in the unauthorized practice of law in direct violation of both Colorado law and this court's October 2001 Order enjoining her against engaging in legal practice without a license. We hereby hold her in contempt of this court and fine her $6,000. We do not assess any additional amount for costs and attorneys' fees.

The court's Order of October 25, 2001, enjoining Shell against practicing law without a license in Colorado remains in effect.