*Justice Rice, Justice Coats, and Justice Eid would grant the Petition. Justice Márquez does not

## Conclusion

In sum, we conclude that the trial court's findings are supported by the record.

## III.

Accordingly, we reverse the judgment of the court of appeals and reinstate the judgment of the trial court terminating the parent-child legal relationships.

The **PEOPLE** of the State of Colorado, Petitioner

v.

David J. **ADAMS**, Respondent.

No. 08SA324.

Supreme Court of Colorado.

Nov. 30, 2010.

Rehearing Denied Dec. 20, 2010.*

participate.

Kim E. Ikeler, Assistant Regulation Counsel, Denver, Colorado, Attorneys for Petitioner Office of Attorney Regulation Counsel.

Law Offices of Gary S. Cohen, Gary S. Cohen, Denver, Colorado, Attorneys for Respondent David J. Adams.

Justice HOBBS delivered the Opinion of the Court.

Respondent, David J. Adams, contests the recommendations of the Presiding Disciplinary Judge ("PDJ")—appointed as hearing master—in this unauthorized practice of law proceeding.[1] The PDJ recommended that we enjoin Adams from the unauthorized practice of law, assess civil penalties for five such instances, and impose costs upon him. The PDJ concluded that Adams did not hold valid assignments of claims belonging to creditors under the Colorado Trust Fund Statute, section 38–22–127, C.R.S. (2010). The PDJ determined that Adams acted in a representative capacity by pursuing the legal rights of these creditors on a contingency payment basis. Accordingly, the PDJ concluded that Adams engaged in the unauthorized practice of law as a non-lawyer appearing *pro se* on behalf of others.

Although we accept the PDJ's conclusions concerning the unauthorized practice of law, we disagree with the PDJ's generic ruling that claims under the Trust Fund Statute, section 38–22–127(1), are not assignable in any respect. We conclude that Trust Fund claims can be assigned, except that the right to collect treble damages under section 38–22–127(5) cannot be assigned. We determine that Adams engaged in the unauthorized practice of law when he pursued the subcontractors' claims in a representative capacity for them in federal bankruptcy court. Accordingly, we adopt the PDJ's recommenda-

1. Adams raises the following issues on appeal:
 (1) Whether the Presiding Disciplinary Judge erred, as a matter of law, in holding that claims for payment under C.R.S. 38–22–127(1) are not assignable.
 (2) Whether the Presiding Disciplinary Judge erred, as a matter of law, in holding that Adams was acting in a "quasi-representative capacity" in seeking to collect the payment claims assigned to him and in holding that Adams was engaged in the unauthorized practice of law.
 (3) Whether the Presiding Disciplinary Judge erred, as a matter of law, in recommending that Adams be fined.
 (4) Whether costs should be assessed against Adams should this court hold that Adams was engaged in the unauthorized practice of law.
 (5) Whether an injunction should issue setting forth the acts to be enjoined should this court hold that Adams was engaged in the unauthorized practice of law.

tion that Adams pay costs in the amount of $3,029.91 and be permanently enjoined from the further practice of law without a license, consistent with our decision. We decline to accept the PDJ's recommendation for fines.

## I.

Based on the record of proceedings and the PDJ's findings of fact, the facts upon which we base our decision are as follows. Respondent David J. Adams is not licensed to practice law in the state of Colorado. Adams, a commercial airline pilot, operates a collection business, Bulldog Construction Services ("Bulldog"), as a sole proprietorship. Prior to founding Bulldog, Adams operated a landscaping business as the sole officer and owner. In 1999, Adams initiated an adversary proceeding in bankruptcy court to recover payments owed to his business and ultimately collected just under $25,000. Throughout the proceedings, Adams represented himself *pro se* at hearings and researched and filed his own pleadings.

In 2004, Adams founded Bulldog, based on his experience collecting debts for his own business. Adams testified before the PDJ that, as he developed a business plan, he researched the law governing collection agencies and assignments using Westlaw and courthouse resources. He concluded that he could legally receive assignments of debts from subcontractors who were owed money by bankrupt contractors. Adams found potential clients by searching the court records of bankruptcy cases filed by general contractors. Adams then contacted the subcontractors owed payment by these contractors and proposed an arrangement whereby the subcontractors/creditors would assign to him their rights against the contractors/debtors in consideration for Adams' promise to pay them 50% of any amount he collected on their claims. A majority of Adams' subcontractor clients were small, owner-operated corporations.

Initially, Adams had his clients sign two separate, but related documents: an assignment of rights and an agreement for collection services. These 2004 assignments were simple, one-sentence documents which assigned to Adams "all rights to any and all claims" a subcontractor might have against a contractor. The accompanying agreement for collection services included more detailed provisions such as the assignor's (referred to as "clients" in the agreement) right to cancel assignments, with payment to Adams in the amount of $50 per hour billed plus expenses prior to cancellation. Because of standing concerns voiced by the bankruptcy court in *Adams v. Tamminga*, Adams revised the agreements in the spring of 2005 to remove references to Bulldog and eliminate the requirement that clients agree to settlement with the contractor. The revised agreements still referred to the subcontractors as "clients" and provided for a client trust account but authorized Adams to negotiate on his clients' behalf. Adams signed the agreement under the company name, Bulldog Construction Services, and several subcontractors signed as corporate clients. By the end of February 2006, following the court's dismissal of his claims in the *Tamminga* case, Adams reduced the agreements to a single document: an assignment in consideration for the promise of a 50% payment to the assignor contingent on recovery.

Several subcontractors testified before the PDJ regarding the arrangements they made with Adams. The subcontractors consistently stated that Adams made it clear that he was not a lawyer. The subcontractors testified that they thought that they had very little chance of recovering any money, and thus found Adams' proposal to pursue their claims at no initial cost attractive. They testified that they believed they were assigning all of their rights to their claims to Adams and would have no input into his collection efforts besides providing him with documents and perhaps testifying in court.

However, the subcontractors also understood that they had the right to cancel the agreement at any time and have Adams reassign their claims back to them. Alleged assignor Luis Bustillos testified to his understanding that Adams was "trying to collect money for us" and that "unless I changed my mind and tried to get the case away from his hands then I would have to pay him for whatever time" he spent on the case. Likewise, Adams testified that, if one of the sub-

contractors approached him regarding a claim that they no longer wanted to pursue against a debtor, he would stop pursuing the action:

> [I]f for some reason they [the subcontractors/assignors] said, Hey, Dave, we really don't want to do this anymore. You know, we're actually friends, we've become friends with the person that owed us the money ... I would probably say all right. You know, I won't collect on them. I'll stop trying to collect on the debt. Even though it's my debt, that's the right thing to do. So I wouldn't do it.

Several subcontractors referred to the assigned claims as their own, highlighting the ambiguity of both the assignments and the resulting relationship between Adams and his clients. Richard Jeffrey, owner of Bighorn Waste Services testified, "I was having difficulty collecting the money and he offered to assist me in collecting." Likewise, Jeff Teebken, owner of Wyco Fire Protection testified, "I figured my claim was worthless. And I figured if he was willing to pursue it on his time that was excellent by me."

Adams proceeded in his own name to file claims in Chapter 7 federal bankruptcy court cases, the majority of which were on behalf of corporate clients.[2] In each case, Adams asserted claims under the Colorado Trust Fund Statute, section 38–22–127(1) and section 38–22–127(5) that incorporates the civil remedy of treble damages for theft of trust funds under section 18–4–405, C.R.S. (2010). In the course of these proceedings, Adams filed with the court complaints, requests for production, motions to compel discovery and responded to motions to dismiss. The bankruptcy courts dismissed each action, concluding Adams' claims were not based on valid assignments and Adams was not the real party in interest.

In *Adams v. Tamminga*, the bankruptcy court determined that the assignments were not indefeasible[3] because "the transfers were part of a collection agent/principal relationship under which the Claimants [subcontractors] retained rights and control of the 'assigned' claims, thus preventing title of the same from passing to Adams." The court found it significant that the subcontractors retained the power to remove Adams as an assignee at any time after paying Adams an hourly rate, that they were referred to as "clients," and that Adams paid no consideration for the purported assignments. The court questioned Adams' status as the real party in interest early on in the proceedings, and found in its order that the changes Adams made in response did not render the assignments valid because the subcontractors continued to be able to have their claims reassigned. The court held that Adams, a non-attorney, could not continue to represent the interests of others—that is, the subcontractors.

In *Adams v. Thomas*, the bankruptcy court similarly determined that the assignments were not indefeasible, on the grounds that Adams could not arbitrarily abandon a claim because subcontractors would still have a stake in the effort. The court also found that, because the subcontractors would have to work hand in hand with Adams to secure a favorable judgment by testifying and providing documents, this arrangement with the subcontractors amounted to legal representation by Adams.

Adams appealed the *Lucio* and *Thomas* decisions to the United States District Court. In *In re Thomas*, 387 B.R. 808 (D.Colo.2008), the court affirmed the bankruptcy court's rulings. The district court concluded that, while on their face the assignments appeared indefeasible, the contingent payment arrangement distinguished the purported assignment from one in which all interest is transferred for present consideration. *Id.* at 813. The court also concluded that the courts of the state of Colorado would hold that claims under the Colorado Trust Fund

---

**2.** *Adams v. Tamminga*, 04–1797–MER, *Adams v. Pederson*, 04–1854–HRT, *Adams v. Lucio*, 05–1348–ABC, *Adams v. Thomas*, 06–1133–ABC, and *Adams v. Byler*, 07–1082–HRT.

**3.** Indefeasible is defined as "(Of a claim or right) not vulnerable to being defeated, revoked, or lost

<an indefeasible estate>." *Black's Law Dictionary* 837 (9th ed. 2009). Most often used in reference to property rights, the term also describes the bundle of rights, claims and responsibilities which may be transferred by assignment.

Statute, section 38–22–127, are not assignable on a contingency payment basis for collection purposes. *Id.* at 815. In *Lucio,* the court followed the reasoning of *Thomas* and found that Adams did not have standing to pursue the subcontractors' claims. *Adams v. Lucio,* 07–CV–01080–LTB, 2008 WL 906835 (D.Colo.2008).

The People filed a petition with us in September 2008 seeking injunctive relief preventing Adams from engaging in the unauthorized practice of law. After a response from Adams, we remanded the matter to the PDJ to serve as hearing master and report findings of fact, conclusions of law, and recommendations for final disposition. C.R.C.P. 236(a). The PDJ determined that Adams had engaged in the unauthorized practice of law and recommended that we enjoin Adams from the further unauthorized practice of law, allow the People to recover costs, and fine Adams the minimum amount of $1250 total for five incidents of the unauthorized practice of law.

## II.

Although we accept the PDJ's conclusions concerning the unauthorized practice of law, we disagree with the PDJ's generic ruling that claims under the Trust Fund Statute, section 38–22–127(1), are not assignable in any respect. We conclude that Trust Fund claims can be assigned, except that the right to collect treble damages under section 38–22–127(5) cannot be assigned. We determine that Adams engaged in the unauthorized practice of law when he pursued the subcontractors' claims in a representative capacity for them in federal bankruptcy court. Accordingly, we adopt the PDJ's recommendation that Adams pay costs in the amount of $3,029.91 and be permanently enjoined from the further practice of law without a license, consistent with our decision. We decline to accept the PDJ's recommendation for fines.

We first analyze the validity of the assignments at issue and then turn to the question of whether Adams' conduct constitutes the unauthorized practice of law.

## A.

### Standard of Review

■ We may adopt the report of the hearing master or modify or reject it in whole or in part. C.R.C.P. 237(a); *Unauthorized Practice of Law Committee of the Supreme Court of Colorado v. Grimes,* 654 P.2d 822, 823 (Colo.1982). We accept the hearing master's findings of fact unless they are clearly erroneous and unsupported by the record. *People v. Shell,* 148 P.3d 162, 171 (Colo.2006). After reviewing the report of the PDJ acting as hearing master and the objections and briefs of the parties, we determine as a matter of law whether the respondent has engaged in the unauthorized practice of law. C.R.C.P. 237(a).

## B.

### Assignability of Trust Fund Claims

■ A general proposition of Colorado law is that an assignee of a claim may bring an action, including when there is a separate agreement providing that collection on the claim (sometimes on a contingency payment basis) will be transferred to the assignor. *Thibodeaux v. Creditors Serv., Inc.,* 191 Colo. 215, 217, 551 P.2d 714, 715–16 (1976); *Bankers Trust Co. v. Int'l Trust Co.,* 108 Colo. 15, 27, 113 P.2d 656, 662 (1941). A contingency payment may provide valid consideration for an assignment and does not bear upon the assignee's status as the real party in interest. *Thibodeaux,* 191 Colo. at 217, 551 P.2d at 715–16; *accord Sprint Communications Co. v. APCC Services, Inc.,* 554 U.S. 269, 271, 128 S.Ct. 2531, 171 L.Ed.2d 424 (2008).

■ While Colorado law generally favors the assignability of rights, it disallows assignments involving matters of personal trust and confidence or personal service. *Roberts v. Holland & Hart,* 857 P.2d 492, 495 (Colo.App.1993). Moreover, an assignment must be complete and effective in order for the assignee to be become the real party in interest with the right to maintain an action in his own name. *Hoeppner Const. Co. v. U.S. for Use of Mangum,* 287 F.2d 108, 111 (10th Cir.1960). To decide whether a claim is assignable, we must first determine wheth-

er it is survivable under section 13–20–101, C.R.S. (2010), which states:

> All causes of action, except actions for slander or libel, shall survive and may be brought or continued notwithstanding the death of the person in favor of or against whom such action has accrued, *but punitive damages shall not be awarded nor penalties adjudged* after the death of the person against whom such punitive damages or penalties are claimed ...

(emphasis added); *Kruse v. McKenna,* 178 P.3d 1198, 1200 (Colo.2008) (citing *Micheletti v. Moidel,* 94 Colo. 587, 591, 32 P.2d 266, 267 (1934) ("The general rule is that assignability and descendibility go hand in hand.")).

In *Kruse,* we clarified the test for determining if a statutory claim is one for a penalty and therefore not survivable under section 13–20–101. *Id.* at 1201. If a claim is not survivable, it is not assignable. *Id.* at 1200. A claim is for a penalty when, (1) the statute creates a new and distinct cause of action; (2) the claim would allow recovery without proof of actual damages; and (3) the claim would allow an award in excess of actual damages. *Id.* at 1201. Applying this test, we determined in *Kruse* that a claim under the Telephone Consumer Protection Act seeking $500 in liquidated damages per violation (as well as treble damages for willful violations) was a claim for a penalty and therefore not assignable.

We have not previously addressed the assignability of claims brought under the Trust Fund Statute contained within Colorado's General Mechanics' Lien laws. The District Court analyzed this issue in *In re Thomas,* where the same facts were before that court in the context of bankruptcy proceedings. 387 B.R. 808. In *Thomas,* the court held that claims under the Trust Fund Statute were not assignable on a contingency payment basis for collection purposes.

The Trust Fund Statute was added to the General Mechanics' Lien laws in 1975. Section 38–22–127 provides:

> (1) All funds disbursed to any contractor or subcontractor under any building, construction, or remodeling contract or on any construction project shall be held in trust for the payment of the subcontractors, la-

borer or material suppliers, or laborers who have furnished laborers, materials, services, or labor, who have a lien, or may have a lien, against the property, or who claim, or may claim, against a principal and surety under the provisions of this article and for which such disbursement was made.

> . . .

> (5) Any person who violates the provisions of subsections (1) and (2) of this section commits theft, as defined in section 18–4–401, C.R.S.

Section 18–4–401, C.R.S. (2010) outlines the elements of criminal theft and section 18–4–405 provides a civil remedy for criminal theft:

> All property obtained by theft, robbery, or burglary shall be restored to the owner, and no sale, whether in good faith on the part of the purchaser or not, shall divest the owner of his right to such property. The owner may maintain an action not only against the taker thereof but also against any person in whose possession he finds the property. In any such action, the owner may recover two hundred dollars or three times the amount of the actual damages sustained by him, whichever is greater, and may also recover costs of the action and reasonable attorney fees; but monetary damages and attorney fees shall not be recoverable from a good-faith purchaser or good-faith holder of the property.

In *In re Regan,* we held that the plain meaning of the statute must be construed in a manner consistent with the statutory scheme of the Mechanics' Lien laws. 151 P.3d 1281, 1283 (Colo.2007). The Mechanics' Lien laws are over one hundred years old and provide a right to file a claim against property to a broad range of laborers, subcontractors, and material suppliers who had worked to add value to such property. *Id.* at 1284. These laws are read liberally to effectuate their purpose in preventing the unjust enrichment of property owners and contractors. *Id.* at 1285. Section 38–22–117, C.R.S. (2010) of the Mechanics' Lien laws provides that any party claiming a lien may assign that lien and the assignee may then pursue all "rights and remedies of the assignor."

*Medical Arts. Bldg. v. Ervin,* 127 Colo. 458, 461, 257 P.2d 969, 971 (1953).

■ The assignment of any common law or statutory claim must be clear and final so that defendants are protected from collateral actions by alleged assignors. *Agate Irrigation & Land Co. v. Sigman,* 83 Colo. 464, 467, 266 P. 209, 211 (1928). No specific formality is required to execute a valid assignment, but the intent to make an assignment must be clearly reflected in the plain language of the parties' agreements. *Lookout Mountain Paradise Hills Homeowners' Ass'n v. Viewpoint Associates,* 867 P.2d 70, 73–74 (Colo.App.1993); *Parrish Chiropractic Centers, P.C. v. Progressive Cas. Ins. Co.,* 874 P.2d 1049, 1055 (Colo.1994). An assignment which appears to be absolute on its face may not be completely effective if parol evidence demonstrates an intent departing from the terms of the assignment. *Harambee Enterprises, Inc. v. State Bd. of Agric.,* 511 P.2d 503, 504 (Colo.App.1973); *see Coosewoon v. Meridian Oil Co.,* 25 F.3d 920, 930 (10th Cir.1994)("In determining the intent of the parties to an assignment, all facts and circumstances surrounding the transaction must be taken into consideration.").

We disagree with the PDJ's general ruling that claims under subsection one of the Trust Fund Statute, section 38–22–127(1), are not assignable on a contingency payment basis. Established Colorado law and a recent United States Supreme Court opinion recognize that statutory claims may be assigned on a contingency payment basis. *Thibodeaux,* 191 Colo. at 217, 551 P.2d at 715–16; *Sprint Communications Co.,* 554 U.S. at 271, 128 S.Ct. 2531. Therefore, the contingent payment portion of the agreements Adams drafted does not of itself invalidate the assignments.

The assignability of claims under the Trust Fund Statute must be read in light of the rule announced in *Kruse* and the context of the General Mechanics' Lien laws. Claims under the General Mechanics' Lien laws are broadly assignable. Therefore, following the reasoning of *In re Regan,* the legislature did not intend to prohibit the assignment of Trust Fund Statute claims. 151 P.3d at 1283. The purpose of the Trust Fund Statute is to protect subcontractors, laborers and material providers as well as property owners by setting up a fund to pay subcontractors/creditors under section 38–22–127(1). *Id.* at 1286. The ability of this broad group of creditors to assign their claims for collection is critical to the goals of the statute. Section 38–22–127(1) provides a cause of action for subcontractors, as well as property owners, for breach of a contractor's duty to hold funds in trust that the property owner has paid to the general contractor, for payment to subcontractors. *Id.*

Claims held by the subcontractors/creditors are in the nature of contract claims or property claims. Such claims are much more closely related to the liens the same subcontractors could have taken out under section 38–22–101, C.R.S. (2010) of the General Mechanics' Lien Laws than any personal or tort claim which might not be assignable. In *Roberts,* the court of appeals found that the relationship between an attorney and client would be undermined by the free assignability of legal malpractice claims. 857 P.2d at 495–96. The relationship between the subcontractor/creditors and the contractors/debtors who owed them a fiduciary duty as trustees of project funds is not similarly at risk by assignment of Trust Fund claims. Instead, allowing subcontractors/creditors to assign their claims would encourage contractors/debtors to abide by their obligations under the statute. This case does not therefore implicate the policy concerns that motivated the court in *Roberts* to find that legal malpractice claims are not assignable. *See Brown v. Gray,* 227 F.3d 1278, 1295 (10th Cir.2000).

■ Applying the *Kruse* test, we conclude that, although a claim for breach of trust under section 38–22–127(1) of the Trust Fund Statute is assignable (even on a contingency payment basis), the right to the penalty of treble damages under section 38–22–127(5) and the incorporated civil theft remedies under sections 18–4–401 and 18–4–405 is not assignable. *Kruse* prevents collection of a penalty by an assignee, and section 38–22–127(5) meets all three prongs of the test announced in *Kruse* for determining non-assignability. 178 P.3d at 1201. First, the

civil theft provision (section 18–4–401) imported into section 38–22–127(5) is a new and distinct cause of action. *In re Regan*, 151 P.3d at 1287. Second, courts have found that damages under the civil theft statute may be obtained without proof that the taker was convicted of criminal theft. *Chryar v. Wolf*, 21 P.3d 428, 431–32 (Colo.App.2000). Third, the language of civil theft statute section 18–4–405 expressly permits recovery of "three times the amount of actual damages" sustained by a plaintiff. Several courts have accordingly held that claims under section 18–4–405 were intended to be punitive rather than remedial. *In re Marriage of Allen*, 724 P.2d 651, 656 (Colo.1986); *Montoya v. Grease Monkey Holding Corp.*, 883 P.2d 486, 490 (Colo.App.1994).

Accordingly, a claim under the Trust Fund Statute section 38–22–127(5) for treble damages is for a penalty and therefore cannot be pursued in court under an assignment. Assignment by a subcontractor/creditor of a Trust Fund statute section 38–22–127(5) claim to a third party cannot include the right to seek treble damages under the statute because *Kruse* prohibits another from standing in the shoes of someone who has a right to collect the penalty. The claim an assignee can pursue is the right to obtain payment of the funds that should have been placed in trust pursuant to section 38–22–127(1) and paid to the subcontractor. In contrast, a subcontractor who does not assign this claim to another may have treble damages when bringing a successful suit for breach of the trust obligation.

### C.

### The Assignments in This Case Were Ineffective

In this case we determine that the assignments were not final and effective. However, we do not base our conclusion that Adams engaged in the unauthorized practice of law solely upon the ineffective assignments. Instead, we rely on the facts in the record of this case in reaching our conclusion that Adams appeared for the subcontractors in a representative capacity in bankruptcy court.

The assignments Adams based his bankruptcy court filings upon were not complete, final and valid assignments. The subcontractors/assignors retained a significant interest in their claims. The assignments at issue were not effective because they did not wholly divest the purported assignors of any interest in their claims as demonstrated by admissible parol evidence. *Agate Irrigation & Land Co.*, 83 Colo. at 467, 266 P. at 211. Testimony before the PDJ coupled with the terms of the assignment contracts demonstrated that these assignments were not binding, because Adams' subcontractor clients maintained the right to reassignment of their claims. According to their testimony, the clients were expected to assist and cooperate in the pursuit of the claims in court, and they had significant influence upon and control over their claims.

Throughout the bankruptcy litigation in federal court, Adams sought collection of civil penalties in the form of treble damages. In *Kruse* we held that the plaintiff lacked standing to assert the civil penalty claims because he obtained them through void assignments. 178 P.3d at 1202. Thus Adams could only have undertaken these actions for collection of civil penalties in a representative capacity on behalf of the subcontractors.

In his complaints in both the *Tamminga* and *Lucio* cases (filed in 2004 and 2005 respectively), Adams claimed the right to collect treble damages under civil theft provisions embraced by the Trust Fund Statute: "[p]ursuant to C.R.S. § 18–4–405, the owner of stolen property may recover from the taker three times the amount of the actual damages sustained, and may recover costs and reasonable attorney fees." Likewise, in his 2006 complaint in the *Thomas* case, Adams made a demand for damages of $211,798 stemming from an original debt owed to subcontractors of approximately $50,000 on the basis of interest, costs, collection expenses and treble damages.

The fifty-fifty contingent payment arrangement between Adams and the subcontractors assumed that all of the parties to the assignments would be enriched by treble damages. Because the subcontractors' claims to treble damages under the Trust Fund Statute were

not assignable, Adams never had the right to pursue them. The PDJ concluded that, "Respondent did not hold valid assignments of claims because the claims arose under the statute and the claims still belonged to the subcontractors/creditors."

Evidence in the record shows that the subcontractors, as well as Adams, never believed that the revised assignments worked any substantive change in the nature of their representative relationship. Adams testified before the PDJ as follows regarding his revisions of the assignments:

It would be my opinion, and I think the testimony of the subcontractors, that whether or not this was a new agreement or just a clarification of the old agreement, there really was no difference in their minds and my mind. It was still the same thing.

Adams' subcontractor client, Luis Bustillos, testified that the basic agreement with Adams never changed despite the three separate documents he signed. As to the third agreement, Bustillos said "I'm pretty sure I got this document ... I really don't remember when I got the document or how I got it." Bustillos further testified that he retained the right to change his mind and "get the case away from his [Adams'] hands." Likewise, subcontractor Richard Jeffrey testified that he had no memory of the simple assignment form in particular but signed in the hopes of "any possibility of getting money."

The record supports a conclusion that the assignments the subcontractors executed at various times created a client-collector relationship which included the ability of the purported assignor/subcontractors to control the litigation by demanding reassignment of their claims. In *Adams v. Pederson*, the bankruptcy court held that "[t]he revised version of the assignment does not change the nature of the relationship between Mr. Adams and his collection clients and does not change the Court's view with respect to the validity of the assignment of the underlying claim to Mr. Adams."

Based on evidence in the record, the PDJ did not err in finding and concluding that Adams pursued the bankruptcy proceedings at all times in a representative capacity for the subcontractors on the basis of faulty assignments.

### D.

### Unauthorized Practice of Law

1. **Standard of Review and Applicable Law**

This court has exclusive jurisdiction under the Colorado Constitution to define the practice of law and prohibit the unauthorized practice of law. Colo. Const. art. VI, § 21; C.R.C.P. 228; *Unauthorized Practice of Law Committee of the Supreme Court of Colorado v. Prog*, 761 P.2d 1111, 1115 (Colo.1988). To determine whether a person engaged in the unauthorized practice of law, we review the report of the PDJ and may adopt or reject it in whole or in part. C.R.C.P. 237(a). We accept the factual findings of the PDJ, unless they are clearly erroneous and unsupported by the record, and come to our own conclusions of law. *Shell*, 148 P.3d at 171; C.R.C.P. 237(a).

The first step in our inquiry centers on whether the *pro se* appearance is representative of another's rights. *Watt, Tieder, Killian & Hoffar v. U.S. Fidelity & Guar. Co.*, 847 P.2d 170, 173 (Colo.App.1992). Second, we determine whether the acts in question implicate an attorney-client relationship and involve the exercise of legal discretion, constituting the unauthorized practice of law. *See* Colo. RPC, 1.1 (2008); *Perkins v. CTX Mortgage Co.*, 137 Wash.2d 93, 969 P.2d 93, 102 (1999) (lay exercise of legal discretion is prohibited because of potential harm to the public).

 An individual has the right to represent himself *pro se*, as his own counsel in civil and criminal cases; however that individual may not appear *pro se* to represent the rights of another. 28 U.S.C. § 1654 (2006); *Denver Bar Ass'n v. Public Utilities Comm'n*, 154 Colo. 273, 281, 391 P.2d 467, 472 (1964); *Grimes*, 654 P.2d at 824.

 Corporations cannot appear *pro se* and may only appear in a court of record

represented by counsel.[4] C.A.R. 5(b)(7); *Flora Const. Co. v. Fireman's Fund Ins. Co.*, 307 F.2d 413, 414 (10th Cir.1962). With a valid assignment *and* counsel, a licensed collection agency that is also a corporation may recover accounts payable, even when those accounts are assigned on a contingency payment basis. *Thibodeaux*, 191 Colo. at 217, 551 P.2d at 715–16.

Although we have no direct precedent, other jurisdictions have condemned the practice of individuals receiving assignments and appearing in court *pro se* in an attempt to circumvent utilizing licensed counsel. *See Palazzo v. Gulf Oil Corp.*, 764 F.2d 1381, 1385 (11th Cir.1985) (corporation could not assign claims to an officer to bring them on his own behalf *pro se* ); *see Jones v. Niagara Frontier Transp. Auth.*, 722 F.2d 20, 23 (2d Cir.1983) (procedural device of an assignment cannot circumvent rules preventing a lay person from representing a corporation). Creative attempts to represent the rights of others while appearing *pro se* have been held to constitute the unauthorized practice law. *Christiansen v. Melinda*, 857 P.2d 345, 349 (Alaska 1993) ("A statutory power of attorney does not entitle an agent to appear pro se in his principal's place."); *Brown v. Unauthorized Practice of Law Comm.*, 742 S.W.2d 34, 42 (Tex.App.1987) (contracts to act as plaintiffs' agent on a contingent payment basis to collect personal injury claims constituted the unauthorized practice of law).

▆ The second step of our inquiry turns to whether the character of the questioned non-lawyer conduct reflects aspects of an attorney-client relationship.[5] Non-attorneys engage in the unauthorized practice of law when they act in a representative capacity to protect, enforce, or defend the legal rights of another. *Denver Bar Ass'n*, 154 Colo. at 279, 391 P.2d at 471. In all of the cases we have reviewed, the courts prohibited activities that involved the lay exercise of *legal discretion*, such as advice to clients regarding legal matters, preparation of court pleadings and ap-

pearance in court. *Perkins*, 969 P.2d at 102; ABA/BNA Lawyers' Manual on Professional Conduct, *Prohibitions on Practice of Non-lawyers*, 21:8002 (2010).

The Colorado Rules of Civil Procedure define the practice of law as follows: "(i) Furnishing legal counsel, drafting documents and pleadings, and interpreting and giving advice with respect to the law, and/or (ii) Preparing, trying or presenting cases before courts, executive departments, administrative bureaus or agencies." C.R.C.P. 201.3(2)(b)(i)-(ii); *see Shell*, 148 P.3d at 171 (quoting *Grimes*, 654 P.2d at 824 n. 1). Non-attorneys are prohibited from undertaking these activities, which require the exercise of legal discretion or judgment, on behalf of another. *See* Colo. RPC 1.1 ("Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."). The purpose of the bar and our admission requirements is to protect the public from incompetent legal advice and representation. *Grimes*, 654 P.2d at 826.

### 2. Application to Adams' Activities

▆ We apply the above principles to this case to hold that Adams did not pursue his own rights, but pursued the rights of others. The facts found by the PDJ demonstrate a representative relationship between Adams and his client subcontractors wherein Adams consulted and cooperated with his purported assignors in pursuing their claims. In addition, the evidence before the PDJ established that the relationship Adams had with his clients involved exercising legal discretion on behalf of the subcontractors he sought to represent.

Adams' "Agreement for Collection Services" reflects aspects of an attorney-client relationship. *See* C.R.C.P. 23.3 (governing contingent fee agreements for legal services). For example, the agreement called for payment of his time should the client decide to

---

**4.** None of the exceptions to the rule apply to this case, since all of the claims at issue exceed $10,000. *See* § 13–1–127(2), C.R.S. (2010).

**5.** The legal discretion we describe here is not pertinent to certain administrative tasks fre-

quently carried out by non-attorneys, such as the completion of documents associated with real estate transactions. *See Cardinal v. Merrill Lynch Realty/Burnet, Inc.*, 433 N.W.2d 864, 869 (Minn.1988).

dismiss Adams' services. Adams signed the agreement under the company name, Bulldog Construction Services. Some of the subcontractors signed as corporate clients.

Adams only changed his "Agreement for Collection Services" after bankruptcy courts rejected the assignments. After Adams changed his assignment forms, the subcontractors still "understood Respondent could reassign the claim back to them." In the words of the PDJ: "Respondent testified that the subcontractors ... whether or not in writing, always retained the right to back out of an assignment prior to resolution of the claim." Adams exercised legal discretion when he drafted and revised these agreements.

We have determined that attempts to assign these claims to Adams were ineffective because they were not final and effective assignments. As the bankruptcy court in *Tamminga* held, the subcontractors retained substantial rights and ultimate control of their claims thereby preventing title from passing to Adams. Without a valid assignment, Adams had no right to pursue the subcontractors' claims.

Adams engaged in the unauthorized practice of law when he proceeded to file claims in court to recover debts owed to the subcontractors, most of whom had incorporated their businesses and thus could only otherwise appear in court represented by licensed counsel. *Flora Const. Co.*, 307 F.2d at 414. Adams engaged in the unauthorized practice of law when he attempted to exercise legal discretion by formulating the legal and factual basis for his clients' claims, seeking discovery, and responding to motions to dismiss regarding standing amongst other activities. *See Perkins*, 969 P.2d at 102. Adams' purported assignments were based on inadequate and faulty legal analysis. Throughout the proceedings he sought treble damages for civil theft under the Trust Fund Statute, a right personal to the subcontractors that cannot be assigned.[6]

---

6. In this case, the subcontractors retained their right to bring in their own capacity a trust fund action that includes a claim for treble damages because the assignments were not final and indefeasible.

In summary, Adams engaged in the following practice of law: 1) representing incorporated businesses though he was not a licensed attorney, 2) drafting pleadings for his clients, seeking discovery, and responding to adversaries' legal pleadings, 3) filing pleadings and appearing in court to represent the subcontractors' interests, and 4) establishing aspects of an attorney-client relationship with his subcontractor clients. All of this conduct constitutes the unauthorized practice of law. *Grimes*, 654 P.2d at 824–25; *Watt, Tieder, Killian & Hoffar*, 847 P.2d at 173; *In re UPL Advisory Opinion 2002–1*, 277 Ga. 521, 591 S.E.2d 822, 823 (2004).

### E.

### Fines and Costs

C.R.C.P. Rule 236(a) provides for the PDJ to recommend fines for the unauthorized practice of law:

> If the hearing master makes a finding of unauthorized practice of law in the report, then the hearing master shall also recommend that a fine be imposed for each incident of unauthorized practice of law; the minimum fine for each incident shall not be less than $250 and not more than $1000.

However, we may "adopt the report or modify or reject it in whole or in part." C.R.C.P. 237(a). We construe this provision to allow us to increase, reduce, or not impose a recommended fine. The assessment of costs by this court in unauthorized practice of law proceedings is permitted under C.R.C.P. 237(a). The PDJ found that Adams engaged in five incidents[7] of the unauthorized practice of law after January 1, 2007, the effective date of C.R.C.P. 236(a). The PDJ recommends that this court impose the minimum fine on each of these incidents, totaling $1,250. Adams' violations are mitigated because his activities were not malicious or pursued in bad faith. *See Shell*, 148 P.3d at 167 (violation of court's injunction preventing

---

7. Adams represented five subcontractors—Garcia, Bustillos, Kyes, Jeffrey and Hirshfeld—whose claims he pursued in the *Lucio* and *Thomas* bankruptcy proceedings and related appeals.

respondent's further unauthorized practice of law justified imposition of $6,000 fine); *see Prog*, 761 P.2d at 1114 (respondent filed pleadings without legally cognizable issues which included personal attacks on defendants, judges and public officials). However, Adams' pursuit of these claims over a number of years despite early warnings from the bankruptcy court aggravates his violations. In consideration of the totality of circumstances, we decline the PDJ's recommendation to impose fines upon him, but assess costs to Adams in the amount of $3,029.91.

### III.

Accordingly, we conclude that Adams engaged in the unauthorized practice of law in prosecuting five claims in federal bankruptcy court. We enjoin Adams from the further unauthorized practice of law, and order that he pay costs in the amount of $3,029.91.

Justice EID concurs in part and dissents in part, and Justice RICE and Justice COATS join in the concurrence in part and dissent in part.

Justice EID, concurring in part and dissenting in part.

I agree with the majority's holding that a claim for the recovery of trust funds under section 38–22–127(1) of the Trust Fund Statute is assignable on a contingency fee basis. Accordingly, I join parts II.A., B. and C. of the majority's opinion. However, I disagree with the majority's determination that Adams engaged in the unauthorized practice of law after January 1, 2007, and therefore dissent from the remainder of the opinion.

### I.

The majority rests its unauthorized practice of law determination on two grounds, neither of which is persuasive. First, while the majority properly concludes that the initial assignments to Adams were invalid because the subcontractors retained significant control over the assigned claims, the record demonstrates that by February of 2006, Adams had replaced the invalid assignments with new assignments in which the subcontractors "fully and completely assign[ed]" all rights to any and all claims. Adams therefore did not act in an improper representa-

tive fashion when he pursued the claims after January 1, 2007.

Second, the majority concludes that, because only the claim for the recovery of the trust funds themselves, not the treble damages penalty, is assignable, Adams engaged in the unauthorized practice of law in pursuing the claim for treble damages. But the consequence of pursuing an assigned claim that is later determined to be non-assignable as a matter of law is simply that the assignee cannot collect on the unassignable portion of the assignment, not that he engaged in the unauthorized practice of law. *See, e.g., Kruse v. McKenna*, 178 P.3d 1198, 1202 (Colo.2008) (affirming trial court's dismissal with prejudice of assignee's action to recover assigned claim where claim was unassignable as a matter of law). For these reasons, I respectfully dissent from the majority's holding that Adams engaged in the unauthorized practice of law.

### II.

At the hearing before the presiding disciplinary judge, serving as the hearing master, the People presented evidence of nine different agreements between subcontractors and Adams that purported to assign, to Adams, certain claims against three contractors. The People asserted that Adams' subsequent pursuit of the claims in bankruptcy court after January 1, 2007 amounted to the unauthorized practice of law. The hearing master agreed with the People's argument in five of the nine instances and held that, in those five cases, Adams engaged in the unauthorized practice of law because the subcontractors' claims under the Trust Fund Statute were unassignable on a contingency fee basis. The hearing master reasoned that because Adams would be paid on a contingent fee basis, he was representing the subcontractors' interest, rather than his own, in pursuing the claims and that therefore he engaged in the unauthorized practice of law.

The majority opinion, correctly in my view, departs from the hearing master's conclusion that the claims under the Trust Fund Statute are unassignable on a contingency fee basis. I agree with the majority that the right to recover trust funds is assignable on a contin-

gency fee basis, but that the right to recover treble damages is unassignable because it is a penalty. Maj. op. at 263–64. But the majority then goes on to find that Adams engaged in the unauthorized practice of law on two, in my view unconvincing, rationales.

### A.

The majority's first rationale is correct as a matter of law, but incorrect as applied to the facts of this case. Essentially, the majority finds that because the subcontractors retained a significant interest in their claims, Adams' pursuit of them amounted to representation of the subcontractors' interests, and hence amounted to the unauthorized practice of law. Maj. op. at 266–67. In other words, the majority finds that the assignments created an impermissible representative relationship. While I agree that the initial documents between the parties created such a representative relationship, the documents that were in place at the time pertinent here made clear that Adams pursued the assigned claims on his own behalf.

The majority states that "no specific formality is required to execute a valid assignment, but the intent to make an assignment must be clearly reflected in the plain language of the parties' agreements." Maj. op. at 263 (citing *Lookout Mtn. Paradise Hills Homeowners' Ass'n v. Viewpoint Assoc.*, 867 P.2d 70, 73–74 (Colo.App.1993); *Parrish Chiropractic Ctrs., P.C. v. Progressive Cas. Ins. Co.*, 874 P.2d 1049, 1055 (Colo.1994)). The majority's analysis in the remainder of its opinion, however, is untethered from the actual documents at issue in the case.

The alleged violations in this case are based on assignments related to five subcontractors. All of the assignments were originally executed in March and April of 2005. Each assignment consists of two documents: an "Assignment of Rights to Debt of Claim" (the "Assignment") and an "Agreement for Collection Services" (the "Collection Services Agreement"). *See, e.g.*, Pet'r Ex. 120 & 121. The Assignment broadly conveys to David J. Adams any and all claims held by the subcontractor against a single, specific contractor. This Assignment, in and of itself, is valid. However, the Collection Services Agreement, executed at the same time as the Assignment, is problematic.

That agreement places certain terms on the purported Assignment and conflates the assignment of rights to a claim with the offering of collection services. Specifically, the Agreement refers to the purported assignor as "Client," and allows the Client to maintain control over the methods of collection,[8] inspect the books of the assignee,[9] cancel the agreement,[10] reassign the claim to itself,[11] and restrict future assignments.[12] Read together, the provisions describe a representative relationship for the performance of collection services, the pursuit in court of which amounts to the unauthorized practice of law. Although in some of the later versions of the five Collection Services Agreements, Adams began to cross-out the language allowing for a withdrawal of the account at the election of the subcontractor,[13]

---

**8.** Clause 2 of the Collection Services Agreement states that "the Company", i.e., Bulldog Construction Services and David J. Adams, shall comply "with all internal policies of Client concerning collection activities, provided, the Company is made aware of such policies prior to beginning any collection activities."

**9.** Clause 7 states that the Client "shall have the right during the Company's normal business hours to reasonably inspect and audit the Company's books and records relating to all of the Client's Accounts."

**10.** Clause 13 allows Client to cancel the agreement at any time "by sending the Company a 30–day notice via certified mail requesting cancellation of the Company–Client Agreement."

**11.** Clause 4 allows withdraw/reassignment of the claim upon election of the Client and after the payment of an hourly rate of fifty dollars per hour plus expenses.

**12.** Clause 15 restricts future assignment of the assignee's rights in the claim without prior written consent of the Client.

**13.** The Collection Services Agreement between Adams and three subcontractors, the last line of Clause 4, which allows for Client-elected withdrawal and reassignment of the claim, is crossed out.

the remaining clauses still invalidate an assignment of all interest in the claim.

Significantly, however, in February 2006—after the bankruptcy court issued its ruling in *Adams v. Tamminga,* 04–1797–MER, finding that Adams had no standing to pursue the assigned claims under the original form of assignment and subsequent forms with stricken language—Adams drafted and completed new assignments with all five of the relevant parties.[14] The new forms of assignment resemble the form of assignment previously used and are similarly titled "Assignment of Rights to Claim." However, they are not accompanied by a Collection Services Agreement. They consist of a single paragraph, in which the subcontractor "fully and completely" assigns to "David J. Adams, doing business as Bulldog Construction Services ('Adams')" all rights to any and all claims against the bankrupt contractor, in consideration for "50% of any amounts collected by Adams" on the claim. The new assignment form states unequivocally that Adams is "the sole party in interest to any action" regarding the claims and divests the named subcontractor to any right to action relating to the claims. Based on the language of the new assignment, the subcontractors did not retain any interest in the assignment except the right to be paid based upon the outcome of Adams' collection efforts. These assignments were valid.

The language of the new assignments shows the clear intent to replace prior assignments and agreements by stating that the new assignment is "the full and complete agreement" between Adams and the subcontractor. The new assignments, on their face, displace the earlier ones. Therefore, after February 2006, Adams was the sole party in interest to the claims.

As the sole party in interest, Adams could pursue the claims pro se. Under Colorado law, corporations are required to be represented by counsel but an individual has the right to represent himself pro se, as his own counsel, in civil and criminal cases. C.A.R. Rule 5(b)(7); 28 U.S.C. § 1654. Because the

new form of assignment assigns all claims to David J. Adams, an individual doing business as, the claims can be pursued by Adams pro se, without representation and regardless of the contingency fee basis for payment. *See Sprint Comm. Co. v. APCC Servs.,* 554 U.S. 269, 128 S.Ct. 2531, 171 L.Ed.2d 424 (2008) (upholding the right to sue by an assignee for collection on a contingency fee basis); *see also Thibodeaux v. Creditors Serv., Inc.,* 191 Colo. at 217, 551 P.2d at 715–16 (1976) (stating that a contingency payment may provide valid consideration for an assignment and does not bear upon the assignee's status as the real party in interest).

The majority finds that the subsequent assignments continued to be invalid because, "[i]n the words of the [hearing master]: '[Adams] testified that the subcontractors ... whether or not in writing, always retained the right to back out of an assignment prior to resolution of the claim.'" Maj. op. at 267. Apparently, the hearing master based this conclusion on Adams' testimony, in which he stated a willingness to reassign the claims back to the subcontractors if they had so requested because "[e]ven though it's my debt, that's the right thing to do." Maj. op. at 260.

It is unclear why the majority finds this fact to be significant. While Adams would have reassigned the claims as a matter of good business practice, such willingness would not defeat the validity of the assignments; he made clear in his testimony that "it's my debt." Moreover, the majority cites no authority for the proposition that an assignment loses its validity upon reassignment; nor does it point to any evidence that Adams ever actually reassigned the claims.

It may be the case that the majority believes that the second assignments could be defeated by a contrary understanding of the subcontractors. *See* maj. op. at 259–60, 264–65. Yet there is no justification for relying on parol evidence in this case to contradict the language of the new assignments. *See Boyer v. Karakehian,* 915 P.2d 1295, 1299 (Colo.1996) ("In the absence of allegations of

---

14. The new assignments are undated but facsimile date stamps show dates between February 17 and February 22, 2006.

fraud, accident, or mistake in the formation of the contract, parol evidence may not be admitted to add to, subtract from, vary, contradict, change, or modify an unambiguous integrated contract."). Nor does the holding of the bankruptcy court in *Adams v. Pederson*, 04–1854–HRT, stand for this proposition.[15] In addition, such an understanding would run directly counter to the hearing master's findings. According to the hearing master:

> The testimony of the subcontractors/creditors consistently demonstrated they each intended to assign their claim to [Adams] *and thereby surrender all rights to the claim*, except for the 50% contingency from any recovery. In addition, they understood [Adams] could reassign the claim back to them. They understood [Adams] *maintained sole control* over any action to collect the debts including litigation and/or settlement of the claims.

(emphasis added) (footnote omitted regarding Adams' testimony as to his willingness to reassign the claims back to the subcontractors). Indeed, the hearing master concluded that "[t]he evidence presented during the hearing supports a finding that the [subcontractors] did not intend to retain an interest in the assigned claims beyond a contingent right to payment." Had it not found the claims unassignable on a contingency fee basis, the hearing master could not have concluded that Adams engaged in the unauthorized practice of law based on its factual conclusions.

### B.

The majority's second rationale, which is woven throughout the first, suggests that Adams engaged in the unauthorized practice of law because he pursued claims for treble damages, which are not assignable, in addi-

tion to pursuing claims for recovery of the trust funds themselves. Maj. op. at 264–65 ("Because the subcontractors' claims to treble damages ... were not assignable, Adams never had the right to pursue them."). The majority appears to believe that any time a pro se assignee pursues an assigned claim in court, and that claim is later determined to be unassignable, the assignee has engaged in the unauthorized practice of law. But that is simply not the case. As our most recent consideration of this issue demonstrates, the consequence of pursuing an assigned claim that is later determined to be unassignable as a matter of law is simply that the assignee cannot collect on that claim, not that the assignee has engaged in the unauthorized practice of law. In *Kruse*, we affirmed the trial court's dismissal with prejudice of an assignee's claim for liquidated damages because we found that the damages constituted a penalty that could not be assigned. 178 P.3d at 1202 (affirming trial court's dismissal with prejudice of assignee's action to recover assigned claim where claim was unassignable as a matter of law).

The majority does not expressly explain why it believes that pursuing an unassignable claim on a pro se basis amounts to the unauthorized practice of law. It appears to believe that the pro se pursuit of an assignment that is deemed invalid *on any basis* amounts to the unauthorized practice of law. Maj. op. at 264 (citing the hearing master's holding that the assignments were invalid because they arose under the Trust Fund Statute). But not every invalidity renders the pro se pursuit of an invalid assignment the unauthorized practice of law. The specter of unauthorized practice is raised only when the invalidity suggests a representative relationship.[16] Adams' pursuit of treble damages in

---

**15.** The majority incorrectly quotes the *Pederson* Order as stating that the new assignments were ineffective. Maj. op. at 264–65. However, *Pederson* merely adopted the reasoning of *Adams v. Tamminga* and held that the initial revisions made to the Collection Services Agreement (similar to those discussed in footnote 6 above) did not alter the nature of the relationship between Adams and the subcontractors. The new assignments at issue here, which did serve as final and complete transfers of the rights of the subcontractors, were drafted and completed in 2006

after (and based on) the bankruptcy court's ruling in *Tamminga*. Therefore, the *Pederson* holding applies only to the initial changes to the Collection Services Agreement (which failed to change the relationship between Adams and the subcontractors) but does not address the subsequent, valid assignments completed in 2006.

**16.** For example, the hearing master concluded that the fact that the assignments were made on a *contingency fee basis* transformed Adams' pursuit of them into the unauthorized practice of

addition to the recovery of trust funds does not, in and of itself, mean Adams engaged in the unauthorized practice of law; it only becomes problematic if that pursuit was done on a representative basis. Indeed, if the majority were correct—that is, if a pro se assignee risked engaging in the unauthorized practice of law if the assigned claim he was pursuing was ultimately determined to be unassignable—far fewer assignments would be made or pursued. This is contrary to the proposition that "Colorado law generally favors the assignability of rights." Maj. op. at 261 (citing *Roberts v. Holland & Hart,* 857 P.2d 492, 495 (Colo.App.1993)).

The majority's mistaken belief that any invalidity in the assignment constitutes the unauthorized practice of law by Adams leads it to chastise him for the "inadequate and faulty legal analysis" which served as the basis for the purported assignments and subsequent pursuit of treble damages. Maj. op. at 267. However, our opinion in *Kruse,* in which we determined that a liquidated damages claim constituted a penalty and was therefore unassignable, was not even issued until March of 2008, long after the January 1, 2007, date on which the alleged incidents of unauthorized practice of law occurred here. In fact, in *Kruse* we reversed the court of appeals' contrary holding that was in place at the time pertinent to this case. But even setting the timing issue aside, no court or other body that considered this case prior to the majority's opinion today—not the bankruptcy courts, nor the federal district courts, nor the hearing master—rested its decision on the conclusion the majority reaches: namely, that claims for the recovery of trust funds are assignable on a contingency fee basis, but claims for treble damages for wrongful withholding of the funds are not. In other words, the majority cannot criticize

Adams for failing to come to a conclusion that no other adjudicator reached.

Because I would not find that Adams engaged in the unauthorized practice of law after January 1, 2007, I would not impose costs or fines on him. *See* maj. op. at 267–68 (declining to impose fines but imposing costs). But even if I agreed with the majority that Adams engaged in the unauthorized practice of law, I would not impose costs in this case. The facts presented here run far afield from the core concerns of the prohibition on the unauthorized practice of law. In *People v. Shell,* 148 P.3d 162, 171 (Colo.2006), for example, we found that the respondent had engaged in the unauthorized practice of law where, inter alia, she had "direct[ed]" an individual "to follow her legal advice." Here, by contrast, the hearing master found that the claims were assigned "with the full understanding that [Adams] was not an attorney and that he could not provide ... legal advice." Even in *Shell,* where we imposed fines for respondent's direct violation of this court's order enjoining her from the unauthorized practice of law, we declined to impose costs. *Id.* at 178. To do so here would be inappropriate under the circumstances.

For the reasons stated above, I join part II.A.2. of the majority's opinion, and respectfully dissent from parts II.B. and II.C.

I am authorized to say that Justice RICE and Justice COATS join in this concurrence in part and dissent in part.

---

law. The hearing master reasoned that because of the contingency fee, the subcontractors continued to own the claims, and that therefore Adams was representing their interest when he pursued them. But the hearing master did not suggest

that *any* invalidity in the assignment constitutes the unauthorized practice of law.